**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

───────────────────────────────

TREVIS L. FUNCHES,

                              Plaintiff,

             v.

JUSTIN MILLER,[1] et al.,                    No. 9:20-CV-676
                                             (MAD/CFH)

                              Defendants.

───────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

Trevis L. Funches
02-A-2668
Mid-State Correctional Facility
P.O. Box 2500
Marcy, New York 13403
Plaintiff pro se

Attorney General for the            KASEY K. HILDONEN, ESQ.
State of New York                   Assistant Attorney General
The Capitol
Albany, New York 12224
Attorneys for defendant(s)

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

        Plaintiff pro se Trevis L. Funches ("plaintiff"), who was at all relevant times in the

custody of the New York State Department of Corrections and Community Supervision

───────────────────────────────

[1] The lead defendant named on the Court's docket was terminated from the case following the Court's initial review of plaintiff's complaint.  See Dkt. No. 8 at 44.  As such, the Clerk of the Court is ordered to amend the case caption to reflect Justin Miller, the next named still-remaining defendant, as the lead defendant.
[2] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Correctional Officer ("C.O.") Justin Miller ("Miller"), C.O. C. Burt ("Burt"), C.O. J. Aucter ("Aucter"), C.O. M. Drake ("Drake"), Officer T.J., ("T.J."), Deputy Superintendent of Programs K. Knapp ("Knapp"), Plant Supervisor and Hearing Officer T. Gee ("Gee"), and Sergeant ("Sgt.") Gaurin ("Gaurin") (collectively, where appropriate, "defendants") violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. See Dkt. No. 1 ("Compl.").[3]  Presently before the Court is defendants' motion for summary judgment brought pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56.  See Dkt. No. 49.  Plaintiff filed a response.  See Dkt. No. 62.  Defendants filed a reply.  See Dkt. No. 63.  Plaintiff filed a surreply.[4]  See Dkt. No. 65.  For the reasons that follow, it is recommended that defendants' motion for summary judgment (Dkt. No. 49) be granted in part and denied in part.

## I.  Procedural Issues

### A.  Plaintiff's Response

#### 1.  Local Rule 7.1

In defendants' reply, they argue that plaintiff's response fails to comply with Local Rule 7.1 which requires that a memorandum of law not exceed twenty-five pages unless

---

[3] Plaintiff initially sought to bring his complaint against numerous other individuals. See Compl.  On initial review of the complaint, the Court sua sponte dismissed a number of claims pursuant to 28 U.S. C. § 1915A, and transferred other claims to the Western District of New York.  See Dkt. No. 8 at 43-44.
[4] A surreply is not permitted without permission from the Court.  See L.R. 7.1(a)(1) ("A surreply is not permitted.").  However, plaintiff's surreply is a single page and states that he "stands on his" arguments made in his response.  Dkt. No. 65.  As such, the undersigned finds that striking the surreply is unnecessary.

given permission from the Court.  See Dkt. No. 63 at 7-8[5] (citing L.R. 7.1(b)(1)).

Plaintiff's response memorandum is twenty-eight pages long.  See Dkt. No. 62 at 2-31.

"It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants," because "a *pro se* litigant generally lacks both legal training and experience, and, accordingly, is likely to forfeit important rights through inadvertence if he is not afforded some degree of protection."  Tracy v. Freshwater, 623 F.3d 90, 101 (2d Cir. 2010).  However, a plaintiff's pro se status does not excuse non-compliance with the Local Rules.  See Faretta v. California, 422 U.S. 806, 834, n.46 (1975) ("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."); Edwards v. INS, 59 F.3d 5, 8 (2nd Cir. 1995) ("While a *pro se* litigant's pleadings must be construed liberally, . . . *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

Plaintiff has not been known to thwart repeatedly Local Rule 7.1, and given his pro se status, striking the additional three pages from his response is not warranted at this time.  However, plaintiff is cautioned that regardless of his pro se status, he must comply with the Local Rules in the future.  See Avent v. Platinum Plus Auto Prot., No. 1:19-CV-1494 (BKS/DJS), 2021 WL 706643, at *4 (N.D.N.Y. Feb. 23, 2021)[6] (citation omitted) (explaining that the degree of special solicitude afforded to pro se litigants can "be lessened where the particular *pro se* litigant is experienced in litigation and familiar

---

[5] Citations to the record are to the pagination generated at the top of each page by CM/ECF.
[6] All unpublished decisions cited in this Report-Recommendation and Order are generally provided to plaintiff.  However, in light of the extraordinary length of this Report-Recommendation and Order and the number of unpublished cases that have been cited, the Court will not provide plaintiff with copies of cases that adopt cited Report-Recommendations and Orders.

with the procedural setting presented[]"; and acknowledging that "the [p]laintiff is an experienced litigant," but nevertheless considering the "brief in its entirety.").

### 2.  Raising New or Previously Dismissed Claims

In their reply, defendants argue that plaintiff's response attempts to (1) resurrect claims previously dismissed by this Court, and (2) raise new claims not included in plaintiff's complaint.  See Dkt. No. 63 at 9-11.  Defendants argue that plaintiff has not provided any reason by which the Court should consider any of the claims and that consideration of new claims would be prejudicial to defendants.  See id. at 9-11.

In his response, plaintiff asserts that defendant Knapp violated his First Amendment right to have access to the courts and Eighth Amendment right to be protected from cruel and unusual punishment, and that defendant Miller violated his Fourteenth Amendment rights.  See Dkt. No. 62 at 6-10, 12.  As defendants state, these claims were dismissed by the Court on its initial review of plaintiff's complaint pursuant to 28 U.S.C. § 1915A.  See Dkt. No. 63 at 9-10; see also Dkt. No. 8 at 17-20, 23-25, 38-39.

"[A] brief opposing a dispositive motion is not the appropriate means of seeking to revive previously dismissed claims."  Valentine Properties Assocs., LP v. U.S. Dep't of Hous. & Urb. Dev., 785 F. Supp. 2d 357, 370 (S.D.N.Y. 2011), aff'd, 501 F. App'x 16 (2d Cir. 2012) (summary order) (citing Aventis Environmental Science USA LP v. Scotts Co., 383 F. Supp. 2d 488, 512 (S.D.N.Y.2005) ("A request in an opposition brief to a motion for summary judgment marshaling new facts is an improper means for requesting reinstatement of a previously dismissed claim, and I decline to entertain such a request.")).  "Under the law of the case doctrine, a decision on an issue of law becomes binding precedent in subsequent stages of the same litigation."  Brentwood

Pain & Rehab. Servs., P.C. v. Allstate Ins. Co., 508 F. Supp. 2d 278, 288 (S.D.N.Y. 2007) (citation omitted).  "[T]he prevailing rule in the Northern District recognizes only three possible grounds upon which . . . reconsideration may be granted[]": "(1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice.'" People ex rel. Vacco v. Rac Holding, Inc., 135 F. Supp. 2d 359, 362 (N.D.N.Y. 2001) (citation omitted).  "[C]ourts ordinarily have not defined precisely what constitutes . . . manifest injustice[]"; however, "courts should be loathe to [revisit a prior decision] in the absence of extraordinary circumstances[.]" Oneida Indian Nation of New York v. Cnty. of Oneida, 214 F.R.D. 83, 99 (N.D.N.Y. 2003) (citation omitted); Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (citation omitted).  Plaintiff has not moved for reconsideration nor provided any justification for this Court to reconsider the previously dismissed claims.  See generally Dkt. Nos. 62; 65.  Thus, the undersigned declines to do so.

Next, in his response, plaintiff alleges that Knapp violated his Fourteenth Amendment rights, Gaurin violated his Eighth and Fourteenth Amendment rights, Aucter violated his Fourteenth Amendment rights, and Drake violated his First and Fourteenth Amendment rights.  See Dkt. No. 62 at 6, 10, 15.  Plaintiff also repeatedly refers to C.O. Clintsman as a defendant and attempts to assert claims against him.  See Dkt. No. 62 at 15.  Clintsman is not a defendant in this action.  See Compl. at 1; see also Dkt. No. 8 at 8.  Plaintiff further alleges that his access to communicating with his son who is incarcerated in South Carolina was restricted "under defendant Russo's

regime[.]" Dkt. No. 62 at 29. Anthony Russo is not a named defendant in his action.[7] Plaintiff also asserts facts relating to his receipt of COVID-19 stimulus checks and attaches exhibits concerning the same. See Dkt. No. 62 at 28-29, 54, 57. In his response, plaintiff often references an "Amended Complaint." Id. at 9, 11-12, 17. Plaintiff has not filed an amended complaint in this action, nor did he ever seek leave to do so.

It is well settled that arguments and claims raised for the first time in response to a motion for summary judgment should not be considered by the Court. See Valentine Properties Assocs., 785 F. Supp. 2d at 372 (collecting cases to support the contention that it "is impermissible[]" for claims to be "raised for the first time in [the p]laintiffs' motion papers."). Further, a plaintiff "cannot amend his complaint in his memorandum in response to defendants' motion for summary judgment." Auguste v. Dep't of Corr., 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (citations omitted); see also Murray v. Palmer, No. 9:03-CV-1010 (DNH/GLS), 2008 WL 2522324, at *22 (N.D.N.Y. June 20, 2008) ("[A] pro se plaintiff's papers in opposition to a motion to dismiss may sometimes be read as effectively amending a pleading (e.g., if the allegations in those papers are consistent with those in the pleading). However, a pro se plaintiff's papers in opposition to a motion for summary judgment may not be so read, in large part due to prejudice that would inure to the defendants through having the pleading changed after discovery has occurred and they have gone through the expense of filing a motion for summary judgment.").

---

[7] Anthony Russo is a named defendant in another case that plaintiff brought in this District which was closed in June 2022 following a jury verdict and judgment in Russo's favor. See Funches v. Russo, et al., 9:17-CV-1292 (TJM/TWD), Dkt. Nos. 143; 145.

On initial review of plaintiff's complaint, the Court did not construe plaintiff's complaint as raising Fourteenth Amendment claims against Knapp, Gaurin, Aucter, or Drake; an Eighth Amendment claim against Aucter; or a First Amendment claim against Drake. See generally Dkt. No. 8. Plaintiff did not object to the Court's liberal construction of his complaint or seek to amend his complaint after the Court dismissed "all remaining claims arising out of plaintiff's confinement at Gouverneur" Correctional Facility ("Gouverneur") aside from those permitted to proceed. Id. at 43. As plaintiff has provided no justification for this Court's consideration of any claims, allegations, or defendants outside of those permitted to survive initial review, the undersigned declines to do so. See generally Dkt. Nos. 62, 65.

Plaintiff attached to his response a copy of a letter he wrote to the Court on May 12, 2022. See Dkt. No. 62 at 49; see also Dkt No. 61. In this letter, plaintiff stated that he received defendants' motion for summary judgment and "[b]ased upon the delay of filings by the [defendants], plaintiff has received newly evidence demonstrative of deliberate mail delays, by DOCC's Officials." Dkt. No. 62 at 49; see also Dkt. No. 61. Plaintiff did not explain what evidence was allegedly "new[,]" or why he was unable to obtain the evidence previously. Dkt. No. 62 at 49. Plaintiff attached a total of ninety documents to his response memorandum of law. See generally Dkt. No. 62. In their reply, defendants state that plaintiff's response "relies upon his Memorandum of Law and approximately ninety (90) pages of unverified and unidentified records attached to his Memorandum of Law as 'Exhibit A.'" Dkt. No. 63 at 6. Many of plaintiff's attachments relate to claims or arguments that were not raised in his complaint and will not be considered by the Court such as those concerning his access to religious

services, mail communication with his son, video visitation with his family, COVID-19 stimulus checks, his work placement, and his access to a single room or bed.  See Dkt. No. 62 at 34-36, 54, 83-84, 87, 95-96, 101, 105-106.  Many others are duplicates of those submitted by defendants.  See id. at 37-47, 61-82, 85-86, 90, 98-100, 114-22.

There are ten pages that relate to plaintiff's remaining claims that were not submitted by defendants.  See Dkt. No. 62 at 32-33, 91, 94, 102, 107-109.  "The documents submitted in opposition to a summary judgment motion must be properly authenticated in order to be considered by the court at summary judgment stage." Barlow v. Connecticut, 319 F. Supp. 2d 250, 257 (D. Conn. 2004) (citation omitted), aff'd sub nom. Barlow v. Dep't of Pub. Health, Connecticut, 148 F. App'x 31 (2d Cir. 2005); see also Wahhab v. City of New York, 386 F. Supp. 2d 277, 291 (S.D.N.Y. 2005) ("The documents in question are not sworn, they do not contain an affirmation indicating the truth of their contents, nor do they assert a basis in personal knowledge.").  Plaintiff has not verified or authenticated any of the documents he submitted with his response. As such, the Court will not consider them in reviewing whether there are disputes of material fact on the record.  See also Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir. 2010) (quoting Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir. 2004)) ("It is well established that, 'in determining the appropriateness of a grant of summary judgment, . . . the district court . . . may rely only on admissible evidence.'").[8]

---

[8] Some of the documents that plaintiff in his response relate to his remaining claims.  For example, they are responses or dispositions from DOCCS or the Inmate Grievance Resolution Committee ("IGRC"). See Dkt. No. 62 at 32-33, 94, 108-10.  It is unclear why defendants did not submit these documents despite them seemingly pertaining to the other evidence they submitted.  Nevertheless, because defendants did not submit them and they have not otherwise been verified or authenticated, the undersigned will not consider them in reviewing defendants' motion for summary judgment.

Based on the foregoing, the undersigned will address only those claims, and the evidence related thereto, that survived this Court's initial review: (1) retaliation claims against defendants Gaurin, Miller, Burt, Aucter, and Knapp; (2) Eighth Amendment excessive force and failure-to-intervene claims against defendants Aucter, Drake, Miller, and Burt; (3) Eighth Amendment conditions-of-confinement claims against defendants Miller, and Burt; and (4) a due process claim against defendant Gee. See Dkt. No. 8 at 43. To the extent plaintiff submits documents that are identical to those submitted and verified by defendants, the Court will cite to the versions submitted by defendants. Finally, to the extent plaintiff attached numerous exhibits to his Complaint and to the extent they are relevant to his remaining claims, the Court will consider them as part of the complaint. See Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotation marks and citations omitted) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint.").

## B. Defendant T.J.

In their motion for summary judgment, defendants state that "[t]he Office of the Attorney General has not appeared in this action on behalf of [d]efendant 'T. J.' upon whom service was not effected and who was not sufficiently described in order to identify. Nonetheless, [d]efendants move for this action to be dismissed in its entirety with prejudice." Dkt. No. 49-3 at 5, n.1.

Federal Rule of Civil Procedure 4(m) states that "[i]f a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice

to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time." FED. R. CIV. P. 4(m).  The Local Rules shorten a plaintiff's time period to effectuate service, mandating that the plaintiff issue "service of process upon all defendants within sixty (60) days of the filing of the complaint."  L.R. 4.1(b).  Generally, at the motion for summary judgment stage, where a plaintiff had failed to identify and serve unnamed defendants, this Court has dismissed those defendants without prejudice for the plaintiff's failure to comply with Fed. R. Civ. P. 4(m) and Local Rule 4.1(b).  See Hamilton v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:18-CV-1312 (MAD/CFH), 2021 WL 5095962, at *7 (N.D.N.Y. Aug. 18, 2021) (recommending sua sponte dismissal under Rule 4(m) of the "Doe" defendants because it had been "[o]ver two years" since the Court reviewed the plaintiff's complaint and warned him that he needed to identify the "Doe" defendants and failure to do so would result in dismissal), report and recommendation adopted sub nom. Hamilton v. Annucci, 2021 WL 4316747 (N.D.N.Y. Sept. 23, 2021); Taft v. Fricke, No. 9:17-CV-0346 (GTS/CFH), 2019 WL 5197180, at *1, n.2 (N.D.N.Y. July 26, 2019) (same), report and recommendation adopted, 2019 WL 4744225 (N.D.N.Y. Sept. 30, 2019).

Dismissal of a defendant pursuant to Rule 4(m) is within the Court's discretion. See Zapata v. City of New York, 502 F.3d 192, 195 (2d Cir. 2007) (stating that the Second Circuit reviews "for an abuse of discretion a district court's Rule 4(m) dismissal for failure to serve process.").  The Second Circuit has held that "[i]n the Rule 4(m) context, a district court abuses its discretion when, among other things, it dismisses a complaint *sua sponte* for lack of service without first giving notice to the plaintiff and

providing an opportunity for her to show good cause for the failure to effect timely service." Meilleur v. Strong, 682 F.3d 56, 61 (2d Cir. 2012) (citing Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 115 (2d Cir. 2010), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)).  This is "[b]ecause Fed. R. Civ. P. 4(m) requires notice to [the p]laintiff before claims are dismissed[.]" Walsh v. City of Kingston, No. 1:08-CV-00611 (TJM), 2010 WL 681315, at *4 (N.D.N.Y. Feb. 23, 2010).  The Second Circuit explained that "[i]n keeping with th[e] requirement that the plaintiff show 'good cause,' [the Court] generally will not reverse a district court's dismissal of an action for lack of service unless the appellant can 'advance some colorable excuse for neglect.'" Meilleur, 682 F.3d at 61 (quoting Zapata, 502 F.3d at 198).

Here, following initial review of plaintiff's complaint, the Court allowed claims against defendant T.J. to proceed.  See Dkt. No. 8 at 43.  However, the Court did not issue a summons "for defendant T.J. because the U.S. Marshal cannot effect service on an individual who has not been adequately identified by name." Id. at 44, n. 18.  Plaintiff was ordered by the Court to "take reasonable steps to ascertain the identity of defendant T.J. and when identified, seek to amend the complaint to add this individual as a defendant in this action pursuant to Federal Rule of Civil Procedure 15(a)[.]" Id. at 44.  To date, plaintiff has not been warned that his failure to identify and serve defendant T.J. could result in dismissal of the claims against defendant T.J..

This case has been pending for over two years.  See generally Compl.  There is no indication on the docket that plaintiff sought defendants' or the Court's assistance in identifying defendant T.J. or sought an extension of time to serve him.  During his

deposition, defendants' counsel asked plaintiff, "this Officer T.J. that you've identified. T period, J period, do you know his name?" Dkt. No. 50-3 at 54. Plaintiff responded, "Travis, husky voice had, regular officer, never worked with him." Id. at 55. Counsel asked plaintiff if he knew T.J.'s last name. See id. Plaintiff stated, "No. I wrote to Dep Knapp with different programs, I tried to [Freedom of Information Act] that information of each officer because we're allowed to have that information, . . . . I have never received any information related back to that." Id. Plaintiff again testified that "his name is Travis[.]" Id. at 105. In his response to defendants' motion for summary judgment, plaintiff refers to T.J. as a defendant and later as a "non-defendant" but does not address his failure to identify and serve defendant T.J. Dkt. No. 62 at 13-14, 20.

The undersigned finds it unlikely that plaintiff would be able to show good cause as to why he failed to identify and serve defendant T.J. over the past two years where it appears that he knew defendant T.J.'s first name but did not take any steps to ascertain his complete identity and effect service.[9] However, in light of the Second Circuit's guidance in Meilleur, and in deference to plaintiff's pro se status, the undersigned recommends that the Court issue "a conditional dismissal order[]" which orders that the claims against defendant T.J. be dismissed without further order of the Court unless, within thirty (30) days following the District Court's adoption or rejection of this Report-Recommendation and Order, plaintiff shows good cause as to why he has not identified defendant T.J. and obtained personal jurisdiction over him. Walsh, 2010 WL 681315, at *4; see also Mitchell v. City of Albany, No. 08-CV-871 (TJM), 2010 WL 1235389, at *9 (N.D.N.Y. Mar. 31, 2010) ("The claims against the Doe defendants are conditionally

---

[9] Throughout the pendency of this action, plaintiff wrote numerous letters to the Court seeking assistance with other issues. See Dkt. Nos. 18, 20, 34, 37, 40, 58, 61.

dismissed, unless, within five (5) days, [the p]laintiff can demonstrate good cause as to why he has not identified the Doe defendants and obtained personal jurisdiction over each of them.").

## II.  Factual Background

On review of defendants' Motion for Summary Judgment, the facts will be related in the light most favorable to plaintiff as the nonmoving party.  See Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record . . . to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought.").

### 1.  Local Rule 56.1

Local Rule ("L.R.") 56.1 mandates that the party opposing a motion for summary judgment "file a separate Response to the Statement of Material Facts.  The opposing party response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs."  L.R. 56.1(b).  "Each denial shall set forth a specific citation to the record where the factual issue arises."  Id.; see Lee v. City of Troy, 520 F. Supp. 3d 191, 198 (N.D.N.Y. 2021) ("Because a naked denial of a fact the movant claims to be undisputed would do little to help the Court, the opposing party must support every denial with a citation to record evidence supporting a genuine dispute of material fact.").  "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." L.R. 56.1(b) (emphasis omitted).

Defendants submitted a Statement of Material Facts.  See generally Dkt. No. 49-1.  In his response, plaintiff cites Local Rule 7.1(a)(3)[10] and acknowledges that he is required to admit or deny each of defendants' purported material facts and provide specific citations to the record.  See Dkt. No. 62 at 3.  However, rather than complying with this obligation, he summarily asserts that he

> vehemently objects to the misplaced assertions by the defendants'
> counsel who was not present during said events, nor reviewed the Video
> or Audio t[a]pes depicting of plaintiff being escorted from Gouverneur [sic]
> Corr. Fac. B-2 Dorm under restraint or S200 Cameras including Main
> facility S.H.U. and, lastly any offender plaintiff was arbitrarily and
> capriciously moved from was interviewed.

Id.

Plaintiff's failure to provide a response in accordance with Local Rule 56.1(b) permits this Court to deem admitted defendants' properly supported facts that plaintiff does not specifically controvert.  See L.R. 56.1(b); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009) (emphasis added) ("A nonmoving party's failure to respond to a Rule 56.1 statement *permits* the court to conclude that the facts asserted in the statement are uncontested and admissible.").  The Court "may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement."  Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) (citation omitted).  Here, plaintiff did not comply with the Local Rule and the undersigned will be deem admitted any properly supported facts in defendants' Statement of Material Facts that are not specifically controverted by the record.  However, plaintiff's pro se status, the undersigned exercises its discretion to review the

---

[10] The Rule concerning a Statement of Material Facts was formerly L.R. 7.1(a)(3) but was amended on January 1, 2021, to Rule 56.1.  See L.R. 56.1.

record for any disputes of material fact.  <u>See</u> Advisory Committee Notes to 2010 Amendment to Fᴇᴅ. R. Cɪᴠ. P. 56 (noting that when a party "fails to properly address another party's assertion of fact as required by Rule 56(c)," "the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute," and "the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant"); <u>see, e.g.</u>, <u>Parker v. Fantasia</u>, 425 F. Supp. 3d 171, 177, n.2 (S.D.N.Y. 2019) (exercising discretion to review the entire record and "consider whether any facts in the record or in [the p]laintiff's Complaint contradict [the d]efendant's 56.1 Statement.").

### 2.  Undisputed Facts[11]

On April 22, 2019,[12] while housed at Gouverneur defendant Miller searched plaintiff's "cube" while plaintiff was not present but was being subjected to a urine test. <u>See</u> Dkt. No. 49-1 at 2, ¶ 5; Compl. at 6, ¶¶ 32-33.  Plaintiff filed a grievance related to the cube search on April 23, 2019, claiming that his property had been destroyed during the search.  <u>See</u> Dkt. No. 49-1 at 2, ¶ 6; Compl. at 24; Dkt. No. 1-4 at 59; Dkt. No. 51-2 at 8.  Miller submitted a memorandum to his supervisor denying plaintiff's allegations. <u>See</u> Dkt. No. 51-2 at 14.  Plaintiff's grievance was denied by the Superintendent of the Inmate Grievance Program ("IGP").  <u>See id.</u> at 11.  Plaintiff appealed the denial to the Central Office Review Committee ("CORC") and CORC denied the appeal.  <u>See id.</u> at 5, 11.  Plaintiff's grievance and appeal concerning the cube search did not allege facts

---

[11] The undersigned will relay only those facts from the record that are pertinent to plaintiff's remaining claims, as set forth in defendants' Statement of Material Facts and supported by the record, as opposed to a recitation of plaintiff's entire complaint.  <u>See</u> Dkt. No. 8 at 43-44 (dismissing numerous defendants and claims after reviewing plaintiff's complaint).

[12] In plaintiff's complaint, he states that his cube was searched on May 20, 2019.  <u>See</u> Compl. at 6, ¶ 32. However, the grievance submitted with plaintiff's response and all other documents related to the search state that the search occurred on April 22, 2019.  <u>See</u> Dkt. No. 1-4 at 59; Dkt. No. 51-2 at 8, 11.

related to any of plaintiff's other remaining claims against Miller or any other defendant. <u>See</u> Dkt. No. 49-1 at 2-3, ¶¶ 9-21; Dkt. No. 1-4 at 59; Dkt. No. 51-2 at 4, 8, 11, 14.

On April 22, 2019, defendant Gaurin authored a misbehavior report against plaintiff for violating the phone policy which allowed incarcerated individuals to use the phone for one thirty-minute time block per day.  <u>See</u> Dkt. No. 49-1 at 6, ¶ 39; Dkt. No. 1-2 at 16.  Following a disciplinary hearing, plaintiff was found guilty of violating the phone policy and he was sanctioned with a loss of recreation and phone privileges.  <u>See</u> Dkt. No. 1-2 at 13-15.  Plaintiff appealed the hearing decision, and the superintendent affirmed the hearing officer's decision.  <u>See</u> Dkt. No. 49-1 at 6, ¶ 42; Dkt. No. 1-4 at 97; Dkt. No. 1-2 at 12.

Plaintiff filed a grievance related to Gaurin's report, alleging that it was "manufactured."  Dkt. No. 52-3 at 18-19; <u>see</u> <u>also</u> Dkt. No. 49-1 at 6, ¶ 45.  Acting Captain Lieutenant ("Lt.") B. Spooner investigated the grievance and submitted a memorandum to IGP Supervisor Looker explaining the phone policy, the notice that incarcerated individuals were given regarding the phone policy, and the number of times plaintiff had signed up for phone calls.  <u>See</u> Dkt. No. 52-3 at 4-5.  Gaurin submitted a memorandum to the Captain's Office stating the dates and times that plaintiff exceeded the thirty-minute time block for phone calls and attesting that he did not "issue a 'Manufactured' misbehavior report against" plaintiff.  <u>Id.</u> at 7.  On May 7, 2019, "while investigating" plaintiff's grievance, Gaurin reviewed plaintiff's phone records and learned that he violated the phone policy on additional dates and issued a second misbehavior report.  Dkt. No. 1-2 at 17; <u>see</u> <u>also</u> Dkt. No. 49-1 at 6, ¶ 43.

16

On June 10, 2019, the IGP Superintendent denied plaintiff's grievance as without merit explaining the implementation and notices provided concerning the phone policy. See Dkt. No. 52-3 at 3.  The Superintendent also explained that disciplinary hearings can "be appealed in accordance with 7 NYCRR, Chapter V, and that this appeal mechanism affords the opportunity to remedy any factual or procedural errors in a disciplinary report I find this grievance to be without merit."  Id.  Plaintiff wrote to defendant Knapp about his Tier II hearing and the phone policy but did not appeal the denial of his grievance to the CORC.  See id. at 37; see also Dkt. No. 49-1 at 6, ¶ 46.

On June 21, 2019, plaintiff was being escorted to an interview concerning an unrelated incident with another inmate at which time his hands were in mechanical restraints behind his back.  See Dkt. No. 49-1 at 6-7, ¶ 47; Compl. at 11, ¶ 45; Dkt. No. 52-2 at 15.  Some time during the escort, plaintiff vomited.  See Dkt. No. 49-1 at 6-7, ¶ 47; Compl. at 11, ¶ 45; Dkt. No. 52-2 at 15.  Defendant Drake placed his hand on the middle of plaintiff's back and pushed him "to the floor face first, striking his chin on the floor."  Dkt. No. 52-2 at 15; Compl. at 11, ¶ 45.  Plaintiff was evaluated by medical staff, and he was found to have a "reddened left sclera and a jagged full thickness laceration on the under left side of his chin."  Dkt. No. 51-3 at 27; Compl. at 11, ¶ 45.  He was taken to Canton Potsdam Hospital and "diagnosed with a conjunctival hemorrhage, left eye; conjunctival abrasion; chin laceration; contusion of right should[;]" and "received 2 sutures to close the chin laceration and prescribed erythromycin for the corneal abrasion and subconjunctival hemorrhage."  Dkt. No. 51-3 at 27.  Non-party C.O. Clintsman, who was assisting in escorting plaintiff, and defendant Drake completed use of force reports; unusual incident reports were filed; and Sgt. Cowles wrote a

17

memorandum to Lt. Rogers detailing the events and medical findings. See Dkt. No. 51-3 at 28-30; Dkt. No. 52-2 at 9-19. The object that was allegedly retrieved from plaintiff's vomit was tested and yielded a positive result for "synthetic cannabinoids." Dkt. No. 51-3 at 51; see also Dkt. No. 49-1 at 7, ¶ 47; Dkt. No. 52-2 at 12-14. Following his return from the hospital, plaintiff was placed on drug watch. See Dkt. No. 51-3 at 27; Compl. at 11, ¶ 46. Defendants Aucter and Drake authored misbehavior reports against plaintiff for violent conduct, creating a disturbance, drug possession, smuggling, and contraband. See Dkt. No. 49-1 at 7, ¶ 49; Dkt. No. 51-3 at 17-18.

Next, in an unusual incident report, Defendant Burt alleged that on June 25, 2019, he was doing rounds to pass out breakfast and "as he placed the plastic tray on [Special Housing Unit ("SHU")-3 cell, occupied by Inmate Funches [], Officer Burt turned to grab two milks from the feed up cart. While he was turned Inmate Funches threw the plastic tray at Officer Burt and struck him in the left hip." Dkt. No. 52-2 at 20. "Officer Burt immediately turned and closed the feed up hatch." Id.; see also Compl. at 12, ¶ 49. Burt then "finished serving the remainder of the morning meal to the rest of the unit." Dkt. No. 52-2 at 20; see also Compl. at 12, ¶ 49. Burt authored a misbehavior report against plaintiff for the conduct. See Dkt. No. 1-4 at 68.

A disciplinary hearing was held before defendant Gee on July 3, 2019, concerning the June 25, 2019, incident with Officer Burt. See Dkt. No. 52-2 at 39-40. Gee confirmed that plaintiff did not request any witnesses. See id. at 40. Gee wanted to have C.O. Burt testify and Gee adjourned the hearing until C.O. Burt was available. See id. at 42. The hearing resumed on July 11, 2019. See id. Plaintiff objected to the timing of the hearing, arguing that it was untimely, and that he was wrongly pre-confined

in the SHU. See id. at 43. Gee explained to plaintiff that he was confined in the SHU because of other charges, not the charges concerning defendant Burt, and that an extension had been received for the hearing. See id. at 43, 46. Plaintiff asked to "see the extension paper" which granted an extension until July 12, 2019. Id. at 46. Gee showed plaintiff the form and plaintiff again objected to being placed in the SHU. See id. at 47. Following the hearing, plaintiff was found guilty of the charges, and he was sanctioned, among other things, to ninety days in the SHU. See id. at 48.

Plaintiff was transferred from Gouverneur to Upstate Correctional Facility ("Upstate") on August 1, 2019. See Dkt. No. 51-2 at 26. On August 8, 2019,[13] plaintiff wrote a grievance at Upstate complaining that his grievances were not being filed at Gouverneur. See Dkt. No. 49-1 at 4, ¶ 22; Dkt. No. 1-1 at 7. The Upstate grievance states,

> Gouverneur Corr. Fac. Officials has deprive Grievant of opportunity to file grievances and out going mail to court since being received in Small S.H.U. up until his transfer on August 1, 2019. The 11 to 7 officers were responsible working together with C. Burt, J. Miller, Officer T.J. pursuant Sgt. Gaurin, Rockwood[,] and K. Knapp instructions, denying First, Eight, and Fourteenth Amendment constitutional rights including right to lawful Tier III Appeals before Isabella and T. Gee as Congressional text language instructs offenders under P.L.R.A. of 1997e(a).

Dkt No. 1-1 at 7; Dkt. No. 51-2 at 22. Defendants Burt and Miller submitted memoranda to Sgt. J. Beane stating that they did not deny plaintiff access to outgoing mail or "his [r]ight to the grievance process." Dkt. No. 51-2 at 27-28. They also stated that no one instructed them to withhold plaintiff's access to the grievance system or mail. See id. at 27-28. Sgt. Beane then wrote a memorandum to Captain C. Demmon which reiterated

---

[13] Defendants state that plaintiff "filed" the grievance on August 13, 2019. Dkt. No. 49-1 at 4, ¶ 22. Plaintiff's grievance is dated August 8, 2019, but Upstate received and responded to the grievance on August 13, 2019. See Dkt. No. 51-2 at 21-22.

Burt and Miller's statements, stated that plaintiff should be interviewed about the grievance, and noted that plaintiff "was housed in [Gouverneur] SHU from 6/21/19 until he transferred to Upstate Correctional Facility on 08/01/19 and to my knowledge and through investigation inmate Funches was not denied his out going mail or his right to grievance process." Id. at 26.  Plaintiff was interviewed in relation to the grievance and he "stated that inmates housing near him during his time in the small Shu unit in Gouverneur CF had witnessed the allegations.  When asked if he could provide any names he stated 'King in cell 7, Page in cell 8' is all that he could recall." Id. at 24.  The interview memorandum noted that "Inmate Funches had no further information to add to his grievance." Id.  Captain Demmon then sent a letter to IGP Supervisor Looker stating that "[f]ollowing [Sgt. Beane's] investigation, there is no evidence to substantiate the allegations being made by inmate Funches[.]" Id. at 25.

Subsequently, the IGP Superintendent denied plaintiff's grievance, explaining that following the investigation, "no misconduct by staff was found and no further action will be taken at this time." Dkt. No. 51-2 at 23.  Plaintiff appealed the denial to the CORC, arguing that the "decision is repleted with numerous misconceptions of alleged interview of Grievant and members of Executive staff has indeed suborn [sic] staff malfeasance with mail." Id.  The Gouverneur IGP Supervisor provided a memorandum to IGP Supervisor Looker stating that he did not receive a grievance from plaintiff "while he was housed in SHU." Id. at 32.  Sgt. Beane investigated plaintiff's claims of witnesses and submitted a memorandum to Captain Demmon stating that plaintiff was wrong about the cells that the other incarcerated individuals were in and that both had been transferred to other facilities and could not be interviewed.  See id. at 34.  Sgt.

Beane also stated that plaintiff was housed in "SHU A-003" before his transfer to Upstate and "Inmate Paige was on the same gallery but on the opposite side of the center wall.  Logically he could not have been a witness to anything at SHU A-003 cell as there is a wall between them."  Id.  The CORC subsequently denied plaintiff's appeal. See Dkt. No. 49-1 at 4, ¶ 24; Dkt. No. 57 at 26.  The CORC concluded that after a "full hearing of the facts and circumstances in the instant case, the action requested herein is hereby denied as without merit."  Dkt. No. 57 at 26.  The CORC reiterated defendant Burt and Miller's statements that they did not interfere with plaintiff's mail and "noted that the grievant used some of his weekly free postage allowance for outgoing privileged correspondence during this timeframe."  Id.

### 3.  Disputed Facts

Plaintiff asserts that on June 21, 2019, while being escorted by defendants Drake and Aucter and non-party C.O. Clintsman, defendant Aucter punched plaintiff in the stomach, causing him to vomit.  See Compl. at 22, ¶ 84; Dkt. No. 62 at 21.  Plaintiff disputes that he regurgitated anything when he vomited, but defendants assert that he regurgitated "synthetic cannabinoids."  Dkt. No. 51-3 at 51; see also Compl. at 11; ¶ 47; Dkt. No. 62 at 17.  On June 25, 2019, when he was moved to the SHU, he was met by defendants Miller and T.J.  See Compl. at 22, ¶ 86.  He claims that "T.J. threw a flurry of punches to Funches's back causing him to buckle over into corner calling out to escorting Sergeant."  Id. at 22-23, ¶ 86.  He also avers that "Miller punched Funches so hard causing Funches's dentures to fly out of his mouth and stepped closer saying 'I'm Miller remember me now, you wrote a grievance and filed a claim over a cube search.'" Id. at 23, ¶ 86; Dkt. No. 62 at 13.  Then, on June 26, 2019,

> after complaining to Knapp about not receiving entitled legal work and
> Special Diet from Burt[,] Miller and T.J. came to Funches cell cuffed him to
> get his legal work allegedly but upon entry to property room petitioner was
> viciously beaten and stomp to submission for complaining about legal
> work and not being feed.

Compl. at 23, ¶ 87; Dkt. No. 62 at 13.  Plaintiff also alleges that he was denied meals on

July 17 and 18, 2019, by defendant Miller.  See Compl. at 27, ¶¶ 99-100.  Additionally,

unidentified officers denied him the "main entree" of his meal on July 21 and 22, 2019;

they denied him his entire meal on June 25, 2019; and defendant T.J. denied him the

main entrée of his meal on July 24, 2019.  See id. at 12, ¶ 49; 15, ¶ 60, 27, ¶ 101.

Finally, he alleges that on July 24, 2019, plaintiff requested from defendant Knapp that

he be given hearing tapes from a disciplinary hearing or that the tapes be transcribed.

See id. at 15, ¶¶ 59, 60.  Knapp denied plaintiff's request.  See id.

### III. Summary Judgment Legal Standard

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the

submissions taken together "show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986) (citation omitted); see FED. R. CIV. P. 56(a); see also

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party has the

burden of showing the absence of a genuine dispute of material fact by citing to "the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c).  A fact is

material if it "might affect the outcome of the suit," as determined by the governing substantive law; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

If the moving party meets this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248 (citation omitted); see Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (citing Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) (per curiam)); see also Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Where, as here, a party seeks judgment against a pro se litigant, the Court must afford the non-movant special solicitude. See Treistman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit explained,

> [t]here are many cases in which we have said that a *pro se* litigant is entitled to "special solicitude," that a *pro se* litigant's submissions must be construed "liberally," and that such submissions must be read to raise the strongest arguments that they "suggest[.]" At the same time, our cases have also indicated that we cannot read into *pro se*

23

> submissions claims that are not "consistent" with the *pro se* litigant's allegations, or arguments that the submissions themselves do not "suggest," that we should not "excuse frivolous or vexatious filings by *pro se* litigants," and that *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law[]" . . . .

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that when [a] plaintiff proceeds *pro se*, . . . a court is obligated to construe his pleadings liberally.") (citations and internal quotation marks omitted).

## IV.  Exhaustion

### A.  Legal Standard

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration.  See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.").  The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002).  Exhaustion is required even where the prisoner seeks relief not available in the administrative grievance process, such as money damages.  See id. at 524.  "To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility

in which he is incarcerated." <u>Adams v. Annucci</u>, 537 F. Supp. 3d 475, 477-78

(W.D.N.Y. 2021); <u>see</u> <u>Jones v. Bock</u>, 549 U.S. 199, 218 (2007). "In accordance with the

PLRA . . . [DOCCS] has made available a well-established inmate grievance program

. . . [which] involves [] following [a] three-step procedure for the filing of grievances."

<u>Smith v. Kelly</u>, 985 F. Supp. 2d 275, 280 (N.D.N.Y. 2013) (citing 7 N.Y.C.R.R. §§ 701.5,

701.6(g), 701.7).[14]

"[T]he PLRA requires proper exhaustion, which means using all steps that the

agency holds out, and doing so *properly* (so that the agency addresses the issues on

the merits)." <u>Ruggiero v. Cnty. of Orange</u>, 467 F.3d 170, 176 (2d Cir. 2006) (quotation

marks and citations omitted). The PLRA's "exhaustion requirement hinges on the

'availability' of administrative remedies[.]" <u>Ross v. Blake</u>, 578 U.S. 632, 642 (2016)

(brackets omitted). Availability means "an inmate is required to exhaust those, but only

those, grievance procedures that are 'capable of use' to obtain 'some relief for the

action complained of.'" <u>Id.</u> (quoting <u>Booth v. Churner</u>, 532 U.S. 731, 738 (2001)). "An

inmate, that is, must exhaust available remedies, but need not exhaust unavailable

ones." <u>Id.</u> There are "three kinds of circumstances in which an administrative remedy

. . . is not capable of use to obtain relief." <u>Ross</u>, 578 U.S. at 643. First, "an

administrative procedure is unavailable when (despite what regulations or guidance

---

[14] First, an inmate must file a complaint with the IGRC within twenty-one calendar days of the alleged incident. <u>See</u> 7 N.Y.C.R.R. § 701.5(a). Second, an inmate may appeal IGRC's decision to the facility's Superintendent. <u>See id.</u> § 701.5(c)(1). Third, an inmate may appeal the Superintendent's decision to the Central Office Review committee ("CORC"). <u>See id.</u> § 701.5(d)(1)(i). "[T]here is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees." <u>Smith v. Kelly</u>, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (citing N.Y.C.R.R. § 701.8). "In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review." <u>Id.</u>

materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  Id.  (citing Booth, 532 U.S. at 736).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  Id. at 644.

### B.  Whether Plaintiff Exhausted his Administrative Remedies

Defendants argue that this action should be dismissed because "[p]laintiff failed to exhaust his administrative remedies before he commenced this action."  Dkt. No. 49-3 at 14.  Defendants contend that "[p]laintiff was aware and familiar with the grievance filing process and his administrative remedies were available."  Id. at 12.  Despite being aware of the process, defendants assert that "[r]ecords indicate that CORC received just one appeal from [p]laintiff for grievances that were initially filed at Gouverneur Correctional Facility in 2019, and that was for GOV-19600-19 – Cube Search."  Id. at 13.  Additionally, although plaintiff filed a complaint and appealed the denial concerning his grievances at Gouverneur allegedly not being filed by correctional officers, defendants state that the complaint was determined to be "unfounded[,]" and the complaint did not "raise[] the substance of his [] underlying claims"; this, it was "devoid of information to put DOCCS on notice of his additional claims."  Id.

Plaintiff argues that he "substantially complied with the Grievance process at Gouvernuer's [sic] Corr. Fac. and upon arrival at Upstate Corr. Fac."  Dkt. No. 62 at 4.  Plaintiff states that "[m]any of [his] grievances filed or attempted to be filed via the hands

of officials who in way violated the process of filing review pursuant to Directive 4040 three step exhaustion process under 42 U.S.C. § 1997e(a)." Id.  Plaintiff challenges IGP Director Rachael Seguin's declaration submitted in support of defendant's motion which states that "there is no appeal on file at CORC for [p]laintiff Funches related to any issue identified[.]" Dkt. No. 57 at 5, ¶ 14.  Plaintiff asserts that Seguin's statement "is patently untrue and warrant a striking from record." Dkt. No. 62 at 4.  "[P]laintiff points to Exhibit 'B' of Rachael Sequin's Declaration to show a reiteration of his attempted filings of Grievances[.]" Id. at 5.  Exhibit B is a copy of plaintiff's "CORC appeal packed for UST-65469-19[.]" Dkt. No. 57 at 5, ¶ 19.  Sequin declares that the appeal does not include any of the underlying issues in this action.  See id.  Plaintiff argues, however, that

> Grievance UST-65469-19 encompass each incident logged in entitled section 1983 Civi[l] Complaint and noted in his use of weekly free postage for privileged correspondence to Albany Central Office Officials claiming mail tampering, harassment, deprivation of Food, physical abuse, denial of commissary, Malicious cube search, Phone deprivation . . . which all relating named remaining defendants.

Dkt. No. 62 at 5.

Plaintiff appealed two grievances to the CORC: one regarding a search of his cube conducted by defendant Miller and one asserting that his grievances were not being filed at Gouverneur.  See Dkt. No. 51-2 at 5, 7, 23.  This Court previously dismissed plaintiff's destruction of property claim concerning Miller's cube search; therefore, plaintiff's exhaustion of that claim does not impact the outcome of the present motion.  See Dkt. No. 8 at 38-39.  Plaintiff's complaint to Upstate that his grievances were not being filed at Gouverneur does not contain details of when the alleged actions that he was grieving, occurred, or any details beyond a list of the named officers and the

27

Constitutional provisions he believed were violated. <u>See</u> Dkt. No. 1-1 at 7. This is insufficient to demonstrate exhaustion. <u>See</u> <u>Espinal v. Goord</u>, 558 F.3d 119, 126 (2d Cir. 2009) (determining that the plaintiff exhausted his administrative remedies because he named the officers, "the specific date, time, and location about which he complained, and that he was beaten for retaliatory reasons."). As there are no grievances in the record containing facts related to the underlying claims that were filed and appealed according to DOCCS procedures, plaintiff failed to exhaust his administrative remedies prior to commencing this action. <u>See</u> 7 N.Y.C.R.R. § 701.5(b)-(d).

### C. Availability

Once it is determined that a plaintiff has failed to exhaust his or her administrative remedies, "the Court must assess whether administrative remedies were available to" the plaintiff. <u>Stephanski v. Allen</u>, No. 9:18-CV-0076 (BKS/CFH), 2020 WL 806331, at *7 (N.D.N.Y. Jan. 22, 2020), <u>report</u> <u>and</u> <u>recommendation</u> <u>adopted</u>, 2020 WL 777268 (N.D.N.Y. Feb. 18, 2020). Following the Second Circuit's decision in <u>Williams v.</u> <u>Corr. Officer Priatno</u>, 829 F.3d 118 (2d Cir. 2016), courts in this circuit have held that administrative remedies may be unavailable to an incarcerated individual who is housed in the SHU and attempted to file a grievance by giving it to an officer, but it was never filed. <u>See</u> <u>Maldonado v. Mandalaywala</u>, No. 9:17-CV-1303 (BKS/TWD), 2020 WL 1159426, at *15 (N.D.N.Y. Feb. 12, 2020) (collecting cases) (quotation marks omitted) ("Following the Second Circuit's decision in *Williams*, several courts . . . have concluded that where a grievance is both *unfiled* and *unanswered*, the process to appeal . . . is prohibitively opaque, such that no inmate could actually make use of it."), <u>report and</u>

recommendation adopted, 2020 WL 1157643 (N.D.N.Y. Mar. 10, 2020).  The Williams Court "reversed the underlying district court's decision on the defendants' motion to dismiss . . . .  Thus, the Second Circuit was compelled to accept as true the allegations in Williams's complaint, including his assertion that a particular correctional officer never filed his grievance relevant to the subject claim."  Simpson v. Price, No. 9:19-CV-1413 (MAD/ATB), 2021 WL 7367083, at *8 (N.D.N.Y. Dec. 29, 2021), report and recommendation adopted, 2022 WL 336540 (N.D.N.Y. Feb. 4, 2022).  "At the summary judgment stage, however, [the Court is] presented with a more complete record upon which to determine the existence of any genuine issues of material fact."  Id. (citation omitted).

    "Historically, unsupported assertions that a plaintiff 'filed a grievance but that it was somehow lost or destroyed' have generally been found 'insufficient to establish a genuine issue of fact.'"  Simpson, 2021 WL 7367083, at *9 (citation omitted) (collecting cases).  However, "this Court has denied summary judgment on exhaustion grounds where a plaintiff does not have a copy of the grievance, was not confined in the SHU, and has not submitted any contemporaneous correspondence inquiring about the status of his grievance," "but submitted a sworn response and testified under oath that he submitted a handwritten grievance and that he verbally followed up with the grievance office."  Siler v. Fletcher, No. 9:19-CV-00427 (DNH/TWD), 2021 WL 7367109, at *6 (N.D.N.Y. Dec. 17, 2021) (citation and quotation marks omitted), report and recommendation adopted, 2022 WL 405527 (N.D.N.Y. Feb. 10, 2022).  This Court has also denied summary judgment where the plaintiff testified under oath to the date he attempted to file his grievances; he wrote letters to the Superintendent of the

Correctional Facility asking about the status of his grievances; and after not receiving a response, he wrote another grievance. See Siler, 2021 WL 7367109, at *6-7; see also Ortiz v. Annucci, No. 17-CV-3620 (RJS), 2019 WL 1438006, at *9 (S.D.N.Y. Mar. 29, 2019) (denying summary judgment where, "[i]n support of his version of events, [the p]laintiff points not only to his own testimony, but also to a copy of the alleged grievance."); Smith v. Miller, No. 9:20-CV-1435 (GTS/CFH), 2021 WL 6503602, at *9 (N.D.N.Y. Nov. 18, 2021) (citing Maldonado, 2020 WL 1159426, at *17 (denying summary judgment where the plaintiff supported his allegations only by his deposition testimony and produced no copies of grievances or correspondence)) (denying summary judgment where the "plaintiff relies on his verified complaint, a copy of his grievance, a copy of his letter to the Superintendent, his response, and his supplemental response"), report and recommendation adopted, 2022 WL 160312 (N.D.N.Y. Jan. 18, 2022).

"By contrast, this Court has granted a defendant's motion for summary judgment where the plaintiff testified during a 'deposition that he filed a grievance by leaving a plain envelope addressed to the grievance committee for the mail personnel to collect,'" "but did not submit documentary evidence to support the contention and did not verbally follow up with anyone at the prison about the grievance." Siler, 2021 WL 7367109, at *6 (citation omitted); see also Artis v. Dishaw, No. 9:14-CV-1116 (MAD/ATB), 2016 WL 11266599, at *7, n.13 (N.D.N.Y. Sept. 12, 2016) (finding the plaintiff's failure to exhaust was not excusable, in part, because although the plaintiff "state[d] that some grievances were destroyed . . . he ha[d] not submitted any copies of these grievances, nor d[id] he

specify when he attempted to file them"), report and recommendation adopted, 2017 WL 1076343 (N.D.N.Y. Mar. 22, 2019).

Here, plaintiff alleges that the SHU was "not equipped with cameras or mail cart or bags for Offenders to deposit their mail grievances or selection of mail if any is picked up from Funches's gate and not discarded[.]" Compl. at 30, ¶ 110. Plaintiff states that while in the SHU, he was "force[d] to have his grievances put in the hands of Miller, 11 to 7 Officer for SHU and Burt who normally does 16 hours shifts. Said grievances involved them and other officials working to thwart Funches's First Amendment Expression." Id. at 30-31, ¶ 13. He also avers that "Miller and 'T.J.' would come in after Funches placed mail, to wit, grievances on his gate for cronies to puck up and say we're not finish with you're a**." Id. at 31, ¶ 114. Plaintiff alleges that he "has not received any acknowledgment from Grievance of his filings with the[] exception of one filed sometime prior to deposition."[15] Id. at 31, ¶ 115.

The record contains a copy of the grievance that plaintiff wrote to Upstate, complaining that his grievances at Gouverneur were not being filed. See Dkt. No. 1-1 at 7. The record also contains a letter he wrote three months later to Seguin stating that while he was housed in Gouverneur's SHU, he "put to officials Grievances that were not processed or acknowledge[d]." Dkt. No. 1-1 at 9. He explained that he filed the grievance at Upstate complaining about his grievances not being filed at Gouverneur; and "[h]aving heard nothing from none of my Grievances at Gouverneur C.F. or this

---

[15] In his deposition, plaintiff often referred to a different deposition that he took in connection with "the Russo action" as a timeline marker for his allegations that occurred while he was in the SHU. Dkt. No. 50-2 at 39, 45-48; see also Dkt. No. 50-3 at 42. He did not provide a date for that deposition but stated that it occurred at Coxsackie Correctional Facility. See id. at 46-48. A transcript from plaintiff's deposition in that case indicates that it was taken at Coxsackie Correctional Facility on June 7, 2019. See Funches v. Russo, et al., 9:17-CV-1292 (TJM/TWD), Dkt. No. 81-26 at 1.

specific grievance[,] I request your review of the concern matter."  <u>Id.</u>  Plaintiff stated in

his grievance to Upstate and in his deposition that his allegedly unfiled grievances

occurred "since being received in Small S.H.U. up until his transfer on August 1, 2019."

Dkt. No. 1-1 at 7; <u>see</u> <u>also</u> Dkt. No. 50-2 at 28.  In his deposition, plaintiff also testified,

> I've got grievances in where my mail was tampered, where some of my
> grievances wasn't even getting into – wasn't even getting to the grievance
> department.  Like I complained while I was there in SHU.  I asked for
> cameras, I asked for cell clean up.  I couldn't even get a change of
> clothes.  So yes, I put all that on writing and hopefully all of that was sent
> to your office.

Dkt. No. 50-2 at 32.  He stated that he was "putting them inside Officer Burt, Officer

Travis, and Miller's hands.  These are officers that work S.H.U.  So it was hard for me to

really air my grievances out or to get cell clean up.  My diet, I wrote to medical, I wrote

to everybody."  Dkt. No. 50-3 at 80.  Plaintiff was housed in the Gouverneur SHU from

June 21, 2019, until his transfer to Upstate on August 1, 2019.  <u>See</u> Dkt. No. 49-1 at 7,

¶ 49; Compl. at 22, ¶ 86; Dkt. No. 1-1 at 7; Dkt. No. 57 at 33, 39.

This is not a case where a plaintiff provided absolutely no evidence to support his

contentions.  <u>See</u> <u>Simpson</u>, 2021 WL 7367083, at *9 (explaining that the plaintiff

"provided no specifics regarding when the grievances were written, their content, or the

steps he took to provide them to an officer to send to the grievance office.  There is also

no documentary evidence to corroborate the fact plaintiff attempted to file a grievance,

such as follow-up correspondences after his release from SHU.").  Plaintiff has provided

a copy of the Upstate grievance that he wrote complaining of his grievances not being

filed while in the Gouverneur SHU and a follow-up letter that he wrote to Seguin.  <u>See</u>

Dkt. No. 1-1 at 7, 9.

Additionally, the records submitted in support of Seguin's declaration indicate that plaintiff filed a grievance and appealed it to the CORC at Gouverneur prior to being placed in the SHU but after he went into the SHU, there are no grievances on file or appealed to CORC. See Dkt. No. 57 at 9. For instance, plaintiff's grievance concerning Gaurin's allegedly retaliatory misbehavior report was received by IGP and investigated in May of 2019. See Dkt. No. 52-3 at 4-5, 7. Plaintiff was placed in the SHU on June 21, 2019. See Dkt. No. 51-2 at 26. There is nothing in the record showing that grievances were filed after May 2019, until plaintiff reached Upstate.

Defendants argue that plaintiff's other filed grievances support the availability of remedies. See Dkt. No. 49-2 at 12. However, plaintiff's ability to file grievances before being in the SHU, there being no grievances filed while he was in the SHU, and his complaint to Upstate and letter to Seguin stating that his grievances were not being filed while he was in the SHU, support plaintiff's contentions as opposed to discredit them. See Dkt. No. 1-1 at 7, 9; Dkt. No. 52-3 at 4-5, 7; Dkt. No. 57 at 9. This Court has denied summary judgment on exhaustion grounds for similar reasons where the plaintiff "fail[ed] to proffer copies of the grievance(s) he attempted to file" but his claims were supported by his deposition testimony, letters he wrote to the Grievance Committee and Supervisor about whether his grievances had been received, and a response to a different grievance which confirmed that no grievances had been filed at the previous institution. See Stephanski, 2020 WL 806331, at *9; *3 (citing, inter alia, Zulu v. Barnhart, No. 9:16-CV-1408 (MAD/DEP), 2019 WL 2997226, at *13 (N.D.N.Y. Apr. 22, 2019) ("The absence of any official records of [the] plaintiff's initial attempts to grieve the incident comports with [the] plaintiff's assertion that once he handed a grievance

through the feed-up hatch in the SHU, it was out of his possession and it was not filed."), report and recommendation adopted, 2019 WL 2150628 (N.D.N.Y. May 17, 2019)).

Supported by his deposition testimony that he "put[] [his grievances] inside Officer Burt, Officer Travis, and Miller's hands[]" while he was housed in the SHU, there is enough evidence in the record to raise an issue of material fact as to whether administrative remedies were available to plaintiff.  Additionally, although plaintiff's Upstate grievance does not recount the details of each incident underlying his Complaint, he stated that the grievances that were not being filed were "First, Eighth and Fourteenth Amendment" grievances against "[t]he 11 to 7 officers . . . C. burt, J. Miller, Officer T.J. . . . Sgt. Gaurin, Rockwood [] K. Knapp . . . and T. Gee[.]"  Dkt. No. 1-1 at 7.  This mirrors plaintiff's surviving claims which are First, Eighth, and Fourteenth Amendment claims against Miller, Burt, Aucter, Knapp, and Drake.  See Dkt. No. 8 at 43.  As such, the undersigned recommends denying summary judgment on exhaustion grounds as to defendants Knapp, Drake, Aucter, Burt, Miller, and Gee.

The Court comes to a different conclusion as to defendant Gaurin.  As to defendant Gaurin's allegedly retaliatory misbehavior reports, plaintiff filed a grievance complaining of defendant Gaurin's conduct in May 2019.  See Dkt. No. 52-3 at 18-19.  Plaintiff was not housed in the SHU at the time he filed his grievance, the grievance was investigated and denied, and plaintiff does not argue that he ever filed an appeal from the denial to CORC.  See Dkt. No. 1-2 at 16-17; Dkt. No. 52-3 at 3-7, 18-19.  Importantly, plaintiff does not argue that he attempted to appeal the decision to CORC and was unable to do so for any reason.  See generally Dkt. No. 62; see also Dkt. No.

34

52-3 at 3.  To the extent Gaurin wrote a second misbehavior report on May 7, 2019,

after plaintiff's grievance had been investigated, see Dkt. No. 1-2 at 17, there is nothing

in the record to indicate that plaintiff attempted to file a second grievance.  Plaintiff was

not housed in the SHU until June 21, 2019, and has not testified or pointed to any

record evidence that indicates that administrative remedies were unavailable to him

while he was housed in the general population.  See generally Compl.; Dkt. No. 62.  As

such, the undersigned recommends granting summary judgment as to the First

Amendment retaliation claim against defendant Gaurin for plaintiff's failure to exhaust

his administrative remedies where he has not established a dispute of material fact as

to whether remedies were available to him.

       Finally, because, as explained below, plaintiff fails to establish a dispute of

material fact on the merits of the claims against Knapp, Burt, Gee, and Gaurin; the

retaliation claim against Aucter, and the failure-to-intervene claims, the undersigned

recommends granting summary judgment on the merits of the claims.  See infra at 42,

44, 47, 65, 84.  An exhaustion hearing as to plaintiff's grievances concerning those

claims would be unnecessary because regardless of the outcome of the hearing, the

claims cannot proceed on the merits.  As to the retaliation claim against defendant Miller

and the excessive force claims against defendants Miller, Aucter, and Drake, the

undersigned recommends that the Court deny defendants' motion for summary

judgment and hold an exhaustion hearing, at which a fact-finder can assess the

credibility of witnesses and the relative weight of the evidence to determine whether

administrative remedies were available to plaintiff.  This is because, as explained below,

the undersigned recommends allowing those claims to proceed on the merits.  See infra at 51, 58-59, 64.

## V.  Merits of Plaintiff's Claims

### A.  Retaliation Claims

"To prevail on a First Amendment retaliation claim, an inmate must establish '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action.'"  Holland v. Goord, 758 F.3d 215, 225 (2d Cir. 2014) (quoting Espinal, 558 F.3d at 128).  "An inmate bears the burden of showing that 'the protected conduct was a substantial or motivating factor' in the prison officials' disciplinary decision."  Id. (quoting Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996)).  "The defendant official then bears the burden of establishing that the disciplinary action would have occurred 'even absent the retaliatory motivation,' which he may satisfy by showing that the inmate 'committed the . . . prohibited conduct charged in the misbehavior report.'"  Id. (quoting Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002)).  As cautioned by the Second Circuit, "courts must approach prisoner retaliation claims 'with skepticism and particular care,' since 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'"  Burroughs v. Petrone, 138 F. Supp. 3d 182, 206 (N.D.N.Y. 2015) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001)), overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002).

### 1.  Defendant Gaurin

Were the District Court to disagree with the undersigned's conclusion that plaintiff failed to exhaust his administrative remedies or raise a dispute of material fact as to the availability of remedies related to defendant Gaurin, the undersigned alternatively recommends granting summary judgment on plaintiff's retaliation claim against defendant Gaurin on the merits.  Plaintiff asserts that defendant Gaurin wrote two misbehavior reports concerning plaintiff's use of the correctional facility phones as retaliation for plaintiff writing a grievance against defendant Miller and for "making inquiry about early closing of facility Law Library[.]"  See Dkt. No. 62 at 4, 10; see also Compl. at 8, ¶¶ 37-38; Dkt. No. 52-3 at 18-19.

"The filing of prison grievances is a protected activity."  See Brandon v. Kinter, 938 F.3d 21, 40 (2d Cir. 2019) (citing Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003)); see also Roseboro v. Gillespie, 791 F. Supp. 2d 353, 367, n.21 (S.D.N.Y. 2011) (collecting cases in support of the same).  A verbal complaint to an officer can also constitute protected activity.  See Coleman v. Racette, No. 9:18-CV-0390 (MAD/CFH), 2021 WL 4312392, at *11 (N.D.N.Y. May 27, 2021) ("Although the Second Circuit has yet to articulate a bright line rule regarding constitutionally-protected oral speech by an inmate, several district courts in this Circuit have held that a verbal confrontation with a correction officer based on an inmate's dissatisfaction with that officer's directive is one example of speech that is not constitutionally-protected activity.") (collecting cases), report and recommendation adopted, 2021 WL 3508342 (N.D.N.Y. Aug. 10, 2021). Further, it is well-settled that writing a false misbehavior report and imposing sanctions can constitute adverse action.  See Tafari v. McCarthy, 714 F. Supp. 2d 317, 373

(N.D.N.Y. 2010) (citing <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 380-81 (2d Cir. 2004) ("The Second Circuit, in *Gill*, found adverse action where defendants filed a false misbehavior report and plaintiff was imposed a sentence as a result of that report.").

 Plaintiff alleged that he was twice charged in for violating the phone policy "absent a showing of same in description of Incident outlined in report." Compl. at 8, ¶ 37. In his response, he does not argue that the reports were false. <u>See</u> Dkt. No. 62 at 10-12; <u>see also</u> <u>Woodward v. Ali</u>, No. 9:13-CV-1304 (LEK/RFT), 2015 WL 5711899, at * 11 (N.D.N.Y. Sept. 29, 2015) (granting summary judgment because "[w]hile the filing of a false misbehavior report may constitute an adverse action, the record is devoid of any evidence that [the] misbehavior report was, indeed, false."); <u>see also</u> <u>Lowrance v. Achtyl</u>, 20 F.3d 529, 535 (2d Cir. 1994) (explaining that when it is undisputed that an inmate has in fact committed prohibited conduct, a retaliatory discipline claim cannot be sustained). The record indicates that plaintiff used the phone for longer than thirty minutes on April 4 and 17, 2019, as stated in Gaurin's first misbehavior report and he was found guilty of the charges based on the phone records. <u>See</u> Dkt. No. 1-2 at 16-17; Dkt. No. 52-3 at 3-4, 29-30. As to Gaurin's second misbehavior report, it states that plaintiff violated the phone policy on April 22 and 25, 2019. <u>See</u> Dkt. No. 1-2 at 17. However, the phone logs in the record only reflect the April 4 and 17, 2019, violations from Gaurin's first misbehavior report. <u>See</u> Dkt. No. 1-2 at 16; Dkt. No. 52-3 at 28-32, 52-56. There are no records to support Gaurin's report that plaintiff violated the phone policy on April 22 and 25, 2019. <u>See</u> Dkt. No. 1-2 at 17; <u>see also</u> Dkt. No. 52-3 at 28-32.

Nevertheless, plaintiff has not proffered any evidence to support his contention that either misbehavior report was filed in connection with plaintiff filing a grievance against defendant Miller or his complaining about the hours of the law library.  See generally Compl; Dkt. No. 62 at 10.  There is case law that states that when a protected activity and adverse action occur close in time, a causal connection can be inferred. See Cifra v. G.E. Co., 252 F.3d 205, 217 (2d Cir. 2001)  (citation and quotation marks omitted) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").  Defendant Gaurin authored the first misbehavior report on the same day that plaintiff filed his grievance against Miller.  See Dkt. No. 1-2 at 16; Dkt. No. 51-2 at 8.  However, a grievance against another person cannot be used to establish a causal connection.  See Tafari, 714 F. Supp. 2d at 374 (citing Wright, 554 F.3d at 274) ("The Second Circuit has refused to find a misbehavior report retaliatory where the defendant was not named in [the] plaintiff's original grievance and the misbehavior report was filed approximately ten weeks after the grievance was filed."); Roseboro, 791 F. Supp. 2d at 369 (collecting cases) ("[E]ven assuming that Counselor Wingate knew about Roseboro's grievance against Officer Gillespie, he has failed to provide any basis to believe that Counselor Wingate retaliated for a grievance that she was not personally named in.").  Further, "there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment[.]"  Hendricks v. Mallozzi, No. 9:20-CV-1035 (MAD/ML), 2022 WL 1129887, at *5 (N.D.N.Y. Jan. 14, 2022) (citing Washington v. Afify, 681 F. App'x 43, 46 (2d Cir. 2017) (summary order), report and recommendation adopted, 2022 WL 856885

(N.D.N.Y. Mar. 23, 2022).  There is nothing in the record to corroborate the temporal proximity between plaintiff's grievance against Miller and either of Gaurin's misbehavior reports.  There is also nothing in the record to suggest a causal connection between plaintiff complaining about the law library being closed and Gaurin's reports.  As such, in the alternative to his failure to exhaust administrative remedies on this issue, is recommended that summary judgment be granted on plaintiff's First Amendment retaliation claim against defendant Gaurin.

### 2.  Defendant Burt

As to defendant Burt, plaintiff contends that on June 25, 2019, plaintiff "was brought before an animated C. Burt for his property but was simply given what Burt wanted though two folders of Funches's legal work was laid out."  Compl. at 11, ¶ 47. Plaintiff alleges that Burt said, "so you're the f***er that likes writing Officers up and trying to make them loose their jobs?"  Id.  Burt then got in plaintiff's face, pushed him into another officer, the other officer pushed plaintiff onto a table, Burt grabbed plaintiff's neck, and Burt told plaintiff he was not getting his legal paperwork.  See id. at 11-12, ¶ 47.  Plaintiff asserts that on June 26, 2019, Burt denied him a meal after claiming that plaintiff threw and hit him with his food tray.  See id. at 12, ¶ 49.

Although plaintiff's complaint alleges that defendant Burt assaulted plaintiff following comments on writing grievances, plaintiff has not produced any evidence to support his contentions.  In his deposition, defendants' counsel reiterated plaintiff's June 25, 2019, factual allegations that Burt jumped in plaintiff's face, pushed him into another officer, grabbed his neck, and told him he wasn't getting his legal paperwork.  See Dkt. No. 50-3 at 119.  Plaintiff stated, "that was a result of me complaining to the D.S.P. not

about getting my stuff[.]"  Id.  Plaintiff stated that Burt "assaulted me, he's the officer that spit in my face.  He's the officer that – that had my glasses.  He's the officer that was being aggressive towards me when the other officer who have more time was not."  Id. at 120-21.

There is no evidence in the record to support plaintiff's allegation that defendant Burt mentioned plaintiff writing grievances before, during, or after the alleged assault. There is also no evidence to indicate that defendant Burt knew about plaintiff's oral complaint to "D.S.P."  Dkt. No. 50-3 at 119; see also Coleman, 2021 WL 4312392, at *11.  Additionally, plaintiff throwing a food tray at Burt is not protected activity and plaintiff has not otherwise alleged that he exercised a protected activity that caused Burt to deny plaintiff his food.  See Smith v. Miller, No. 15-CV-9561 (NSR), 2017 WL 4838322, at *3, *7 (S.D.N.Y. Oct. 23, 2017) (noting that the plaintiff alleged retaliation by an officer "'intentionally threw two cups of liquid at [the p]laintiff,' and stated, 'see what happens when you piss officers off[]'" and the Court explained that "[a]ssuming, arguendo, that [the d]efendant['s] behavior constitutes an adverse action, [the p]laintiff nonetheless fails to allege a causal connection between his protected activity and [the d]efendant['s] conduct with sufficient specificity.").  Plaintiff has not produced sufficient evidence to raise a dispute of material fact as to whether defendant Burt retaliated against him.  As such, the undersigned recommends granting defendants' motion for summary judgment on this ground.

### 3.  Defendant Aucter

As to defendant Aucter, plaintiff asserts that Aucter denied him commissary, harassed him about his employment at the law library, and punched him in the stomach

41

on June 21, 2019, causing him to vomit.  See Compl. at 5-6, ¶¶ 30-31;11, ¶ 45.  Plaintiff

also alleges that Aucter completed a "dubious report [] contemplated to harm Funches."

Id. at 23, ¶ 88.  Plaintiff has not alleged that any of the actions were taken in connection

with an exercise of protected activity.  See generally Compl.

 In his deposition, as to the June 21, 2019, incident, plaintiff testified that

"whatever reasons that [Drake, Aucter, and Clintsman] accosted me . . . is unfounded.

There is no reason for them to have approached me and came to get me for what and

for what reason.  As a result of that[,] I was assaulted by them."  Dkt. No. 50-3 at 113.

Plaintiff stated, "Basically because of retaliatory from Aucter and his dislike towards

me."  Id.  Plaintiff testified that defendant Aucter "sits up drunk as many of these

officers, maybe right now today after the Bills game, they – and they're high,

disoriented.  I wrote that up.  As a result of writing that up, he came and alleged to have

found some type of drug."  Id. at 58.  Plaintiff stated that the drug charges that came

from the June 21, 2019, incident were eventually dismissed.  See id. at 58, 93.[16]

 Plaintiff also testified that he "only lodged a complaint against Aucter when he

denied me commissary.  As a result of him denying my commissary, he had an issue

because I think an offender, King told him [] that I complained about him sitting at the

desk doing nothing, laying back, sleeping drunk, right."  Dkt. No. 50-3 at 64.  Plaintiff

stated that Aucter "just had a dislike for me."  Id.  He explained that defendant Aucter

"didn't like the fact that I was writing something up.  He is aware of something – that I'm

writing something up."  Id.

---

[16] Plaintiff attaches to his response a copy of the dismissal of the drug possession charge following review of the disciplinary hearing.  See Dkt. No. 62 at 32-33.  However, because the document is not verified or authenticated, the Court cannot consider it as part of the summary judgment record.  See supra at 9-10.

As explained, writing a grievance is a protected activity. See supra at 38. However, there is nothing in the record to support plaintiff's deposition testimony that he "wrote up" defendant Aucter for being drunk, or that he was "writing something up" against him. Dkt. No. 50-3 at 58, 64. There is also nothing in the record from which the Court could infer a causal connection between any protected activity and defendant Aucter's actions. Further, Aucter's "dislike" of plaintiff does not establish a retaliation claim under the First Amendment. Id. at 64; see also Phillips v. Roy, No. 08-CV-878 (FJS/ATB), 2011 WL 3847265, at *12 (N.D.N.Y. Aug. 29, 2011) (dismissing retaliation claim because although the defendant's statements to the plaintiff "indicate that the two men did not get along particularly well, it does not suggest that [the d]efendant [] was interested in hindering [the p]laintiff's religious practice in order to punish [the p]laintiff for filing grievances about the conditions of his confinement."). As plaintiff has not established that he engaged in any protected activity and that Aucter took adverse actions against him because of such activity, it is recommended that defendants' motion be granted as to plaintiff's retaliation claim against defendant Aucter.

### 4. Defendant Knapp

As to defendant Knapp, plaintiff contends that he denied plaintiff's request for disciplinary hearing transcripts or hearing cassette tapes. See Compl. at 15, ¶¶ 59-60. Plaintiff does not support his contentions with any evidence and does not allege that the denial occurred because of his exercise of a protected activity. See generally Compl. In his deposition, he testified that he

> ask[ed] for the minutes, or a tape recorded and the tape for my disciplinary hearings. These are things that's allotted to offenders in order for them to perfect the appeals. She told me, we don't give those out. And as a result

> of my complaints towards her, that afternoon, with regards to my legal
> work, I was taken aside to S.H.U. property room and assault.

Dkt. No. 50-3 at 79.

Plaintiff does not allege or provide evidence to support an inference that Knapp denied his requests because he exercised any protected activity.  See Dkt. No. 50-3 at 79.  Knapp's denial is also not the sort of conduct that would likely deter someone from engaging in protected activity.  See Davis, 320 F.3d at 353 (citations omitted) ("'Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation.' . . .  Insulting or disrespectful comments directed at an inmate generally do not rise to this level.").  Rather, plaintiff continued to file grievances concerning other issues.  See Dkt. No. 51-2 at 3-4.  To be sure, the test for what constitutes an adverse action is an "objective test [that] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." Gill, 389 F.3d at 381.  However, plaintiff has presented no evidence to demonstrate that hearing minutes or tape recorders are normally given out and that the denial would deter a typical prisoner from exercising his or her First Amendment rights.  Cf. Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) (determining that verbal threats and referring the plaintiff to the Office of Mental Health did not constitute adverse conduct). As plaintiff has not established that he engaged in a protected activity and that defendant Knapp's actions constituted an adverse action, the undersigned recommends granting summary judgment on the claims against defendant Knapp.

**5. Defendant Miller**

As to defendant Miller, plaintiff contends that he was assaulted by Miller on July 25 and 26, 2019, and that Miller denied him meals on July 17 and 18, 2019.  See Compl. at 22-23, ¶¶ 86-87; 26-27, ¶¶ 98-100; see also Dkt. No. 62 at 13-14.  Plaintiff asserts that Miller assaulted him and denied him food because of the grievance he filed concerning Miller's search of plaintiff's "cube" and because he asked questions about his legal paperwork and other denials of food.  See Dkt. No. 62 at 12-14.  Defendants argue that "[p]laintiff's assertions are controverted by the records."  Dkt. No. 49-3 at 19.

During his deposition, plaintiff testified that he sued Miller because "Miller had destroyed my individual property, searched me and played a participatory role in beating me while I was in special housing unit in Gouverneur Correctional Facility."  Dkt. No. 50-2 at 21.  When asked to describe the incidents that occurred at Gouverneur, plaintiff testified that his "cube was searched, it was destroyed, my locker was turned over by an officer named Miller.  Miller is a . . . officer that work S.H.U. . . .  He participated in me being beaten up . . . ."  Dkt. No. 50-3 at 24-25.  He stated that while in the SHU, "they did not feed me my food, all that is a matter of record."  Id. at 25.  He explained that he "was starved. . . .  I wasn't getting my . . . therapeutic diabetic snack, they raided my cell, beat me."  Id. at 29.  Plaintiff asserted that this was happening because he "had complaints lodged against they fellow officers including them for that, such harassments."  Id. at 30.  Plaintiff testified that "as a result" of "when the individual write them up and it goes to grievances and outside of grievances, individual go to Court[]" "all these tickets and stuff that I've been incurring."  Id. at 32.

45

Plaintiff explained that "Miller, without question retaliated against me because he had an issue with me complaining about the way that he fell in my cube." Dkt. No. 50-3 at 50. Plaintiff stated that he was placed in the SHU "[a]s a result of my complaints," which is "where [Miller] normally works at" and he was "again beat up by his co-workers. Him running to my cell, being denied my therapeutic diet." Id. at 50-51. Plaintiff stated that once he arrived in the SHU, "[e]verything else happened, him along with all the other officers, they told me to continue to write, we don't care. That's the retaliatory actions." Id. Plaintiff wrote his grievance concerning Miller's cube search on April 22, 2019; he was placed in the SHU on June 21, 2019; and he alleges that the beatings and denials of food occurred on June 25 and 26, and July 17 and 18, 2019. See Dkt. No. 51-2 at 8; Compl. at 22-23, ¶¶ 86-87; 26-27, ¶¶ 98-100.

First, it is undisputed that writing a grievance is protected activity. See Brandon, 938 F.3d at 40. Second, it reasonable to conclude that being physically assaulted and denied meals, both on multiple occasions, could deter a reasonable person from exercising their constitutional rights. See Lewis v. Hanson, No. 9:18-CV-0012 (LEK/DJS), 2022 WL 991729, at *11 (N.D.N.Y. Mar. 31, 2022) (citations omitted) ("[A] reasonable jury could choose to credit [the p]laintiff's statements that [the defendant] assaulted him in the back of the transfer van and in the SHU. It cannot be disputed that a physical assault on a handcuffed prisoner of the type alleged by [the p]laintiff would deter an individual of ordinary firmness from exercising constitutional rights."). This particularly true given that "a physical assault 'need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of a First Amendment retaliation analysis.'" Zielinski v. Annucci, 547 F. Supp.

3d 227, 233 (N.D.N.Y. 2021) (citation omitted).  Third, as to causation, "[a] plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action."  Espinal, 558 F.3d at 129.  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action."  Id. (citation omitted).  Plaintiff wrote his grievance against Miller approximately two to three months before Miller allegedly assaulted plaintiff and denied him food.  See Dkt. No. 51-2 at 8; Compl. at 22-23, ¶¶ 86-87; 26-27, ¶¶ 98-100.

However, "there is significant case law to support the contention that temporal proximity alone is insufficient to survive a motion for summary judgment[.]"  Hendricks, 2022 WL 1129887, at *5 (citation omitted); see also Roseboro, 791 F. Supp. 2d at 370 (collecting cases).  Here, the temporal proximity is supported by the alleged statement made to plaintiff by Miller, "along with all the other officers," that plaintiff could "continue to write, we don't care[]"—which plaintiff testified to under oath during his deposition.  Dkt. No. 50-3 at 51; see also Washington, 681 F. App'x at 46 (explaining that there was temporal proximity and "[i]n addition to this circumstantial evidence, [the plaintiff] produced direct evidence of retaliatory animus: in his affidavit, he alleged that all four of the officers directly confronted him about his practice of filing grievances against prison officials before filing false misbehavior reports.");  Bellamy v. City of New York, 914 F.3d 727, 746 (2d Cir. 2019) ("[A] § 1983 plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact.").  Plaintiff's deposition testimony that he was beaten and denied food by Miller only two to three months after filing his

grievance and his grievance writing being mentioned by defendant Miller and the other officers is sufficient to create a dispute of material fact as to whether Miller retaliated against plaintiff in violation of his First Amendment rights.  See Brandon, 938 F.3d at 43 ("As to causation, [the plaintiff's] evidence [] consists of a combination of temporal proximity and statements showing retaliatory animus.").  As such, it is recommended that the motion for summary judgment be denied against Miller.

### B.  Excessive Force and Failure-to-Intervene Claims

#### 1.  Excessive Force

To bring a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).  "The objective prong 'focuses on the harm done, in light of contemporary standards of decency.  In assessing this component, the court must ask whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation.'" Chambliss v. Rosini, 808 F. Supp. 2d 658, 667 (S.D.N.Y. 2011) (quoting Wright, 554 F.3d at 269).  "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).  However, "the malicious use of force to cause harm[ ] constitute[s] [an] Eighth Amendment violation per se" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)).  "The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimis uses of physical force provided that the use of force is not of a sort repugnant to the conscience of mankind." Hudson, 503 U.S. at 9-10 (citations and internal quotation

marks omitted).  "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it."  Id. at 7.

The subjective prong requires a plaintiff to demonstrate "that the defendant had the necessary level of culpability, shown by actions characterized by wantonness[.]" Sims, 230 F.3d at 21 (citation and internal quotation marks omitted).  The relevant inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson, 503 U.S. at 7; see also Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (per curiam) (citation omitted) (citing Hudson and explaining that the "core judicial inquiry" in excessive force cases is "not whether a certain quantum of injury was sustained.").  The Second Circuit has identified five factors for the Court to consider when assessing whether a defendant acted maliciously or wantonly:

> [t]he extent of the injury and the mental state of the defendant[;] ... the need for the application of the force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response

Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citation and internal quotation marks omitted).

### a. Defendant Miller

Plaintiff alleges that on June 25, 2019, when he "was moved to facility main SHU[,]" defendant Miller asked plaintiff if he knew who Miller was.  Compl. at 23, ¶ 86. Plaintiff stated that he did not, and Miller punched him in the face, "saying 'I'm Miller remember me now, you wrote a grievance and fled a claim over a cube search."  Id. The next day, on June 26, 2019, plaintiff alleges that "Miller and T.J. came to Funches

cell cuffed him to get his legal work allegedly but upon entry to property room petitioner was viciously beaten and stomp to submission for complaining about legal work and not being fed." Id. at 23, ¶ 87.

In his deposition, plaintiff testified that "Miller came in my cell in S.H.U. threw milk in my cell and beat me up. . . . I'll have to have the record to give you a specific date and time that it happened. It happened inside S.H.U." Dkt. No. 50-3 at 104. Plaintiff stated that it happened sometime after June 21, 2019. See id. Plaintiff later affirmed that defendant Miller was "involved in the incident on June 25th, 2019." Id. at 118-19. Plaintiff also testified that after complaining to Knapp about his request for a tape recorder and/or disciplinary hearing minutes, "that afternoon, with regards to my legal work, I was taken aside to S.H.U. property room and assaulted." Id. at 79. Plaintiff did not specify the date or officer(s) who were involved in the property room assault after complaining to Knapp. See id. In a letter that plaintiff wrote to "Anthony Annuncci" the DOCCS Commissioner, dated July 5, 2019, plaintiff stated that on June 25, 2019, he was "transfer[red] to Gouverneur's small Box . . . [and] was beaten by regular officer I believe they called him T.J. with a hat and taken to A-3 cell." Dkt. No. 1-2 at 26. The letter does not mention defendant Miller being involved in the incident. See id. Plaintiff does not allege that he sustained any injuries from the June 25 or June 26 assaults. See Compl. at 22-23, ¶¶ 86-87. As such, there are no medical records to corroborate or discount plaintiff's claims.

Defendants state that "[p]laintiff's assertions are controverted by the records[]" and they cite to "Exhibits E-G." Dkt. No. 49-3 at 22. Exhibit E is a "copy of the grievance appeal packets for GOV-19600-19 and UST 65469-19 and list of grievances

appealed to the Central Officer Review Committee (CORC) for incarcerated individual Trevis Funches[.]" Dkt. No. 49-2 at 2; see also Dkt. No. 51-2. Exhibit F is a "certified copy of [p]laintiff's [] relevant misbehavior report records." Dkt. No. 49-2 at 2; see also Dkt. No. 51-3. Exhibit G is a "copy of the hearing before Defendant Gee on July 11, 2019." Dkt. No. 49-2 at 2; see also Dkt. No. 52-1.

        None of the exhibits that defendants cite discuss anything related to plaintiff's alleged June 25 and 26, 2019, assaults. See generally Dkt. Nos. 51-2; 51-3; 52-1. There is nothing in the record that denies plaintiff's allegations such as an affidavit or deposition from defendant Miller. See Dkt. No. 49-1 at 7 (Defendants' Statement of Material facts); see also Cicio v. Lamora, No. 9:08-CV-431 (GLS), 2010 WL 1063875, at *7-8 (N.D.N.Y. Feb. 24, 2010) (denying summary judgment on the plaintiff's excessive force claim where "[p]laintiff's assertions are sharply contradicted by defendant MacWilliams who, in a sworn affidavit filed with the court, denies punching or striking Cicio. Each of the co-defendants participating in the removal of the plaintiff from his cell state that they did not see MacWilliams punch or hit him. . . . [The p]laintiff's testimony that he was beaten by MacWilliams stands in contrast to the seemingly overwhelming evidence that it did not occur as he alleges. Nonetheless, the weighing of such competing evidence, no matter how weak [the] plaintiff's claim may appear, presents a question of credibility that must be left to the trier of fact."), report and recommendation adopted, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010).

        Plaintiff's excessive force claim turns on his somewhat vague statements in his deposition testimony versus defendants' single statement in their motion that plaintiff's allegations "are controverted by the records." Dkt. No. 49-3 at 22. Plaintiff's case

stands in contrast to cases that have denied summary judgment on excessive force

claims where the plaintiff provided a sworn affidavit and/or much more detail in his

sworn testimony concerning the alleged uses of force.  Here, plaintiff did not submit a

sworn affidavit explaining the alleged June 25 and 26 assaults and his deposition

testimony provides next to no details as to precisely what occurred during either assault

or who perpetrated the "property room" assault.  Dkt. No. 50-3 at 79, 104; see Cicio,

2010 WL 1063875, at *7 (explaining that the plaintiff submitted a sworn affidavit and

testified in his deposition that "the defendants entered the cell and hit him with a shield

he immediately dropped to the floor.  At that point, [the] plaintiff asserts, he could no

longer resist because the corrections officers involved had his arms pinned, and could

have easily handcuffed him.  Instead, [the] plaintiff claims, "[MacWilliams] just kept

hitting me.  He hit me several times. . . .  When I say maliciously and sadistically when

he tells me that, when he's asking me if I want to play, he's hitting me.  That means he'

doing it for his own purpose. . . ."); see also Reed v. McGrath, No. 9:19-CV-1203

(GTS/TWD), 2021 WL 6750625, at *7-8 (N.D.N.Y. Dec. 22, 2021) (denying summary

judgment where the plaintiff testified that the defendant "was on the left side of me,

close to the door, he was closest to the door[]" and "[h]e was hitting me.  He was

punching me, kicking me."), report and recommendation adopted, 2022 WL 252170

(N.D.N.Y. Jan. 27, 2022).

Although plaintiff did not provide much detail in his deposition, if accepted as

true, plaintiff's allegations—that he was punched in the face for no reason and he was

beaten and stomped on—would satisfy the objective and subjective prongs of an

excessive force claim.  Plaintiff does not allege any injury from either incident; however,

52

"[t]he extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was 'unnecessary and wanton[.]'" Johnson v. Brown, No. 9:09-CV-0002 (GTS/DEP), 2010 WL 6243352, at *8 (N.D.N.Y. Sept. 3, 2010) (quoting Whitley v. Albers, 475 U.S. 312, 321 (1986)), report and recommendation adopted, 2011 WL 1097864 (N.D.N.Y. Mar. 22, 2011).  "[C]ourts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force." Id. (citation omitted)

According to plaintiff, defendant Miller was not attempting to subdue or restrain him at the time of either alleged assault and plaintiff was not engaging in any activity that would warrant a use of force.  See Compl. at 22-23, ¶¶ 86-87; see also Dkt. No. 50-3 at 79, 104.  Rather, he alleges that "Miller punched [him] so hard causing [his] dentures to fly out of his mouth[,]" and he "was viciously beaten and stomp to submission[.]"  Compl. at 23, ¶¶ 86-87.  There is no indication in either his complaint or deposition that defendant Miller needed to use force, that plaintiff was acting out of order, or that Miller did anything to limit his use of force.  See Compl. at 22-23, ¶¶ 86-87; Dkt. No. 50-3 at 79, 104.  Defendants provide no evidence concerning these allegations such as whether defendant Miller engaged with plaintiff at all during the time frame of the alleged assaults and if so, in what capacity.  Based on plaintiff's testimony, which is the only evidence in the record concerning these allegations, there was no apparent reason for defendant Miller's actions.  See Compl. at 23, ¶¶ 86-87; Dkt. No. 50-3 at 104.  The record contains a letter that plaintiff attaches to his complaint in which he wrote to the DOCCS Commissioner and in mentioning the June 25, 2019, assault,

he did not name defendant Miller.  See Dkt. No. 1-2 at 26.  Combined with plaintiff's failure to identify defendant Miller as one of the officers who perpetrated the June 26, 2019, property room assault in his deposition testimony, there is a question of material fact as to whether Miller assaulted plaintiff for no reason whatsoever on two separate occasions.

This dispute comes down to a credibility determination as to whether plaintiff's allegations and testimony are believable.  Such determinations are not meant to be resolved as a matter of law at the summary judgment stage.  See Kaytor v. Electric Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citations, quotation marks, and emphasis omitted) ("In reviewing the evidence and the inferences that may reasonably be drawn, the court may not make credibility determinations or weigh the evidence . . . .  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  "[T]he Second Circuit created a very narrow exception to this rule."  Johnson, 2010 WL 6243352, at *9 (citing Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005)).  "[T]he Second Circuit held that summary judgment may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony," "and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that 'no reasonable person' could credit the plaintiff's testimony."  Id. (citing Jeffreys, 426 F.3d at 54-55).[17]

Plaintiff's testimony is not contradictory or incomplete—albeit lacking expansive detail about each alleged assault.  See Dkt. No. 50-3 at 79, 104.  Defendants have not

---

[17] Defendants do not address the Jeffreys exception because, as explained, their argument on this issue consists of a single sentence.  See Dkt. No. 49-3 at 22; see supra at 55.

submitted any evidence to contradict plaintiff's allegations and the undersigned, therefore, cannot find that no reasonable juror would credit plaintiff's testimony. Accordingly, the undersigned finds application of the <u>Jeffreys</u> exception unwarranted. <u>See</u> <u>Butler v. Gonzalez</u>, No. 09-CV-1916 (PAC/THK), 2010 WL 3398156, at *8 (S.D.N.Y. May 18, 2010) (citations omitted) (collecting cases applying the <u>Jeffreys</u> exception and explaining that "each of these cases contains three material distinctions from [the p]laintiff's case: (1) a plaintiff whose own story was internally inconsistent and changed throughout the proceedings . . .; (2) substantial evidence undermining or directly refuting the plaintiff's version of events . . .; and (3) defendants who submitted affidavits or declarations categorically denying the plaintiff's version of events."), <u>report and recommendation adopted</u>, 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010).

As defendants have not presented evidence to contradict plaintiff's allegations, and drawing all inferences in the non-moving party's favor, the undersigned recommends denying summary judgment on plaintiff's excessive force claims against defendant Miller.  <u>See</u> <u>Daum v. Racette</u>, No. 9:15-CV-1083 (DNH/DJS), 2018 WL 7291421, at *13 (N.D.N.Y. Nov. 5, 2018) (denying summary judgment on the plaintiff's retaliation claim where the "[d]efendants have not presented any evidence contradicting [the p]laintiff's testimony."), <u>report and recommendation adopted</u>, 2019 WL 610385 (N.D.N.Y. Feb. 13, 2019); <u>Sloane v. Borawski</u>, 64 F. Supp. 3d 473, 491 (W.D.N.Y. 2014) (citations omitted) ("Crediting [the] plaintiff's version of events, as this court must in considering the defendants' motion for summary judgment, there is a question of fact whether the use of force was unrelated to any effort to maintain order or discipline.").

### b. Defendants Aucter and Drake

Plaintiff contends that on June 21, 2019, defendant Aucter, defendant Drake, and non-party C.O. Clintsman, handcuffed plaintiff, searched him, walked him down the hall, and defendant Aucter punched him in the stomach causing him to vomit. See Compl. at 11, ¶ 45; 22, ¶ 84. Plaintiff asserts that Drake tripped plaintiff and pushed him to the ground and plaintiff suffered a split chin and an eye injury. See id. at 22, ¶ 84. It is undisputed that plaintiff was handcuffed and pushed to the ground causing him to strike his chin. See Dkt. No. 51-3 at 17-18, 20-24, 26-30.

During his deposition, plaintiff testified that he sued defendant Drake because he "was one of three officers that came into that dorm, assaulted me with Aucter and put cuffs on me[.] . . . I think Drake was the escorting officer. Aucter punched me in my stomach and another officer fell on me and I split my chin." Dkt. No. 50-2 at 45. He testified that on June 21, 2019, he was "punched in the stomach[.]" Dkt. No. 50-3 at 111-12, 126. Plaintiff testified that his "chin was split as a result of being in mechanical restraints, punched to the side [of his] stomach by Defendant Aucter and his two participating co-defendants." Id. at 127.

Plaintiff also testified that he did not cough up or regurgitate any substance, but he "heard" that the officers found the substance in another incarcerated individual's cube. Dkt. No. 50-3 at 110, 112. Plaintiff stated that he "was not resistant, there was nothing happening, and [] that within itself require actions and hands being placed on me by officials that was unwarranted." Id. at 113. Defendant Aucter and Drake's and non-party C.O. Clintsman's misbehavior and use of force reports contend otherwise. Aucter and Drake's misbehavior reports contend that plaintiff regurgitated an unknown

substance; and Drake's use of force and misbehavior reports contends that plaintiff "tried to kick [the unknown substance] into 18 cube and then tried to break free and run which required use of force to restrain the inmate."  Dkt. No. 51-3 at 18; see also Dkt. No. 51-3 at 17, 21, 23.  Defendant Aucter's and non-party C.O. Clintsman's reports do not say anything about plaintiff attempting to break free or run away from defendant Drake.  See id. at 17. 20, 22, 24.  Thus, there is a dispute of material fact as to whether plaintiff was punched, without justification, by defendant Aucter; and whether he was resisting or acting in a manner that justified defendant Drake's use of force.

Even where a plaintiff's injuries are slight and "the evidentiary support for [the] plaintiff's claim is far from overwhelming[,]" the Court is required to view the evidence in the light most favorable to the non-moving party.  Cicio, 2010 WL 1063875, at *7-8. Although plaintiff did not allege an injury from defendant Aucter's punch to his stomach, there is nothing in the record that refutes plaintiff's testimony about Aucter's punch, and there is nothing indicate that the punch was required to restore order or maintain discipline.  See Rodriguez v. City of New York, 802 F. Supp. 2d 477, 481 (S.D.N.Y. 2011) (granting summary judgment on the plaintiff's excessive force claims where the medical record noted no visible injuries and the plaintiff complained only of pain in the back of his neck).  As such, the undersigned cannot determine as a matter of law that defendant Aucter did not use excessive force where plaintiff alleges that the conduct occurred for no justifiable reason.  See United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999) (citation omitted) ("[E]ven if the conduct at issue were deemed de minimis, it would fall within Hudson's explicit exception that even de minimis uses of force are unconstitutional if they are 'repugnant to the conscience of mankind.'").  Accordingly, the

undersigned recommends denying summary judgment on plaintiff's excessive force claim against defendant Aucter.

As to defendant Drake, following the use of force, plaintiff was taken to Canton Potsdam Hospital and was "diagnosed with a conjunctival hemorrhage, left eye; conjunctival abrasion; chin laceration; contusion of right shoulder." Dkt. No. 51-2 at 27. Photos of plaintiff's chin and eye contained in the record corroborate the injuries. See Dkt. No. 52-2 at 6. Plaintiff "received 2 sutures to close the chin laceration and prescribed erythromycin for the corneal abrasion and subconjunctival hemorrhage." Id. It is unclear whether plaintiff's eye injuries were a result of the use of force incident or a prior altercation with an inmate because Sgt. Cowles completed a misbehavior report for a fight that plaintiff had been in with another incarcerated individual and plaintiff "admitted that he had received the injured eye during [the] fight[.]" Dkt. No. 51-2 at 16. At the time of Sgt. Cowles interview, he had a "bloodshot left eye[.]" Id. However, the record indicates that plaintiff's interview occurred after defendant Drake's use of force. See id. at 16-18. Plaintiff also summarily asserts in his response that the "interview [] never happened." Dkt. No. 62 at 16. Defendant Drake stated in his use of force report that plaintiff's eye was swollen prior to the use of force. See Dkt. No. 51-2 at 23. Regardless, at this stage, plaintiff's injuries are enough to raise a dispute of material fact as to whether defendant Drake used de minimis force. See id. at 26-27, 29-30; see also Griffin v. Crippen, 193 F.3d 91-92 (2d Cir. 1999) (denying summary judgment on the ground that a bruised shin and swelling over one knee were not de minimis injuries); Miner v. Ramsey, 99-CV-11661 (AKH), 2001 WL 540746, *3 (S.D.N.Y.2001) ("The p]laintiff's wrist was sufficiently bruised and swollen that the examining nurse referred

58

[the p]laintiff for x-rays.  This injury was not de minimis as a matter of law[.]"); cf. Caldwell v. Geronimo, No. 19-CV-8253 (KPF), 2021 WL 3848821, at *2, *5-6 (S.D.N.Y. Aug. 27, 2021) (denying summary judgment on a Fourth Amendment excessive force claim where the only injury the plaintiff alleged was "a 1.5 cm laceration to his chin [where] he received three sutures.").

Further, even if the undersigned determined as a matter of law that the alleged use of force did not meet the threshold for a de minimis injury, there is a question of material fact as to whether the force was used to restore discipline or maliciously and wantonly. Plaintiff testified that he was not resisting the officers in any way, but defendant Drake's reports indicate that plaintiff was trying to "break free" and "run away[.]"  Dkt. No. 50-3 at 114; Dkt. No. 51-3 at 18.  See, e.g., Ross v. Willis, No. 16-CV-6704 (PAE/KNF), 2021 WL 3500163, at *11 (S.D.N.Y. Aug. 9, 2021) (denying summary judgment on an excessive claim, in part, because the plaintiff testified that he could not remember if he "pulled his arm away" from the officer in an act of resistance and "even if it were undisputed that [the plaintiff] had 'pulled away' a single time when officer(s) grabbed him, a reasonable jury could conclude that that was not an act of or signifying actively resistance[]" that warranted the use of force).  As there are disputes of material fact, the undersigned recommends denying defendants' motion for summary judgment as to plaintiff's excessive force claim against defendant Drake.

### c. Defendant Burt

As to defendant Burt, plaintiff contends that on June 25, 2019, defendant Burt pushed him, shoved him onto a table, and grabbed his neck.  See Compl. at 11-12, ¶ 47.  In his deposition, plaintiff stated that "Burt beat me up inside the draft – inside the

property where I attempted to try to get my – my legal stuff." Dkt. No. 50-3 at 105. He stated that Burt was "the officer that assaulted me, he's the officer that spit in my face." Id. at 120.

Plaintiff does not allege any injuries as a result of defendant Burt's conduct. See Rivera v. Connolly, No. 18-CV-03958 (PMH), 2022 WL 1785313, at *5 (S.D.N.Y. June 1, 2022) (collecting cases) ("[T]he total lack of associated medical documentation along with [the p]laintiff's admission that he has never sought medical care for the injuries he allegedly sustained would—even if the shoves were not, by their very nature, *de minimis*—lead to the conclusion that the force used was, in fact, *de minimis*."). Further, "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." Wilkins, 559 U.S. at 38 (citations omitted). Even if accepted as true, plaintiff's allegations that defendant Burt pushed, shoved, and spit in his face are not enough to support an excessive force claim. See Compl. at 11-12, ¶ 47; see Kornegay v. New York, 677 F. Supp. 2d 653, 659-60 (W.D.N.Y. 2010) (granting summary judgment as a matter of law because the alleged force was *de minimis* where the plaintiff alleged that the defendant pushed him "with 'enough force to knock [the plaintiff] off balance to where [he] had to put [his] hands down to catch [his] balance.'"); George v. Cty. of Westchester, No. 20-CV-01723, 2021 WL 4392485, at *9 (S.D.N.Y. Sept. 24, 2021) (collecting cases) ("[C]omparable uses of force—where a corrections officer forcefully shoves or pushes an inmate—are insufficient to satisfy the objective prong of an excessive force claim."). Thus, plaintiff has not presented evidence sufficient to establish the objective prong of an excessive force claim, and the undersigned need not address the subjective prong. See, e.g.,

Williams v. Artus, No. 13-CV-00680A(F), 2018 WL 9946045, at *14 (W.D.N.Y. Sept. 11, 2018) (declining to address subjective prong after concluding that the plaintiff had not satisfied the objective prong), report and recommendation adopted, 2019 WL 5694272 (W.D.N.Y. Nov. 4, 2019).  As plaintiff has not alleged any conduct that rises above the de minimis threshold required for an excessive force claim against defendant Burt, it is recommended that defendants' motion for summary judgment on this issue be granted.

### 2. Failure-to-Intervene

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody."  Hayes v. N.Y.C. Dept. of Corrs., 84 F.3d 614, 620 (2d Cir. 1996) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  "Law enforcement officials[, including prison officials,] can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights."  Tafari, 714 F. Supp. 2d at 342.  A defendant may be liable under a failure-to-intervene theory if: "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  Id. (quoting Jean-Laurent v. Wilkinson, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

"An underlying constitutional violation is a precondition of a failure-to-intervene claim."  Hicks v. Craw, 405 F. Supp. 3d 374, 385 (N.D.N.Y. 2019) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.")).  "Where the record does not disclose an underlying

excessive force violation, and does not suggest that an officer who observed the disputed incident could have been aware of the use of excessive force, summary judgment on a duty to intercede claim is appropriate."  Usavage v. Port Authority, 932 F. Supp. 2d 575, 600 (S.D.N.Y. 2013); see also Rolkiewicz v. City of New York, 442 F. Supp. 3d 627, 646 (S.D.N.Y. 2020) ("Where . . . the Court has concluded already that the predicate claim, excessive force, cannot survive summary judgment, summary judgment is appropriate on the dependent failure to intervene claim as well.") (internal citations omitted).  Here, as to defendants Aucter and Drake, the undersigned recommends allowing the excessive force claims against them to proceed.  See supra at 59-64.

"Where courts in this Circuit determine" that disputes of material fact "exist regarding a plaintiff's underlying excessive force claim, they generally are reluctant to grant summary judgment on a dependent failure to intervene claim unless the evidence is clear that the alleged excessive force was not of a sufficient duration to permit a bystander officer to intervene. "  Ali v. Ramos, No. 1:16-CV-01994 (ALC), 2020 WL 5817009, at *6 (S.D.N.Y. Sept. 30, 2020) (collecting cases).  However, courts have granted summary judgment on failure-to-intervene claims where there was not enough time for the officer defendant(s) to have intervened.  See Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006) (denying summary judgment where the alleged assault occurred when the defendant "stood [the plaintiff] to his feet by his collar and then slammed him against the wall."), aff'd, 461 F. App'x 18 (2d Cir. 2012); Scarbrough v. Thompson, No. 10-CV-901 (TJM/CFH), 2012 WL 7761439, at *11 (N.D.N.Y. Dec. 12, 2012) (denying summary judgment where the alleged use of force

took "fifty seconds"), <u>report and recommendation adopted</u>, No. 9:10-CV-901, 2013 WL
1100680 (N.D.N.Y. Mar. 15, 2013); <u>Henry v. Dinelle</u>, No. 9:10-CV-0456 (GTS/DEP),
2011 WL 5975027, at *9 (N.D.N.Y. Nov. 29, 2011) (citations omitted) (denying summary
judgment because the alleged "use of force was simply too uncertain for a reasonable
person in [the d]efendant['s] [] position to expect; and it was too brief in nature to give"
the defendant a realistic opportunity to intervene where the plaintiff alleged that one of
the defendants "punched him *one time* with a 'closed fist' in the side of his nose,
causing him to immediately fall to the ground[]" and "the kicks that he suffered soon
after falling to the ground were limited in nature, having occurred only 'a couple of
times,' and indeed having only *possibly* occurred.").

Here, defendant Aucter's alleged single punch to plaintiff's stomach and
defendant Drake's alleged act of pushing plaintiff to the ground were too short in
duration to give the other officer a reasonable opportunity to intervene.  As such, the
undersigned recommends granting defendants' motion for summary judgment on
plaintiff's failure to intervene claims against defendants Aucter and Drake.  <u>See</u> <u>Henry</u>,
2011 WL 5975027, at *9, n.16 (collecting cases to support dismissal of a claim where
the alleged use of excessive force was too brief to allow for a realistic opportunity to
intervene).

As to defendant Burt, plaintiff testified that he did not "think that [he] wrote a
failure to intervene with Burt[.]"  Dkt. No. 50-3 at 120.  Further, "[w]here the officer is a
direct participant in the allegedly unlawful conduct, the failure to intervene theory of
liability is inapplicable."  <u>Folk v. City of New York</u>, 243 F. Supp. 3d 363, 376 (E.D.N.Y.
2017) (citation omitted).  As plaintiff has not provided sufficient evidence to establish an

underlying constitutional violation against defendant Burt, or another officer at which time defendant Burt failed to intervene, the undersigned recommends granting summary judgment as to any failure to intervene claim against defendant Burt.

As to defendant Miller, although the undersigned recommends allowing the excessive force claim against him to proceed, plaintiff has not presented evidence sufficient to support a failure to intervene claim against him.  In his response, plaintiff asserts that "Miller failed to stop and/or intervene" when "defendant 'T.J' [was] beating Funches to submission and causing him to buckle over into corner[.]"  Dkt. No. 62 at 13.  Plaintiff states that this "violent attack" occurred when he was being admitted to the SHU and happened right before Miller punched plaintiff in the face.  See id.  In his complaint, plaintiff alleged that when he was moved to the SHU on June 25, 2019, Miller and T.J. "ordered him to face the corner and said, 'any time we speak to you, you are to say "yes Sir," now do you understand?  Funches said yes[.]'  T.J. threw a flurry of punches to Funches's back causing him to buckle over into corner calling out escorting Sergeant."  Compl. at 22-23, ¶ 86.[18]

During his deposition, plaintiff testified that defendant Miller and T.J. were involved in the June 25, 2019, incident.  See Dkt. No. 50-3 at 119-20.  When asked about the excessive force claim he asserted against defendant T.J., plaintiff stated that the basis was the "[s]ame" as his earlier-described incident with defendant Miller which was when "Miller came in my cell in S.H.U. threw milk in my cell and beat me up."  Id. at 104-105.  He stated that T.J. "and Miller was working together, his name is Travis, they

---

[18] As explained, this Court permitted an excessive force claim against T.J. to proceed; however, he has never been identified, served, or appeared in this action; therefore, defendants have not moved for summary judgment on the excessive force claim against him.  See supra at 8; see also Dkt. No. 8 at 43; Dkt. No. 49-3 at 5, n.1.

– they both was together they – . . . cooked up whatever story that they -- that they did to get into my cell." Id. at 105. Plaintiff did not testify that T.J. assaulted him, and that Miller observed it. Stating that the basis of his claim is the "[s]ame" as defendant Miller's is insufficient to raise a genuine issue of material fact as to whether Miller observed T.J. assaulting plaintiff and failed to intervene. Id.; see Rosen v. City of New York, 667 F. Supp. 2d 355, 360 (S.D.N.Y. 2009) (citation omitted) (explaining that one factor in determining a failure-to-intervene claim is whether "[the officer] observed or had reason to know that the [p]laintiff was involved in a physical altercation with another inmate[]").

Further, plaintiff's unsworn complaint and response do not indicate that they were made under the penalty of perjury and are insufficient to establish a dispute of material fact where there is nothing in the record to support them. Cf. Quiles v. City of New York, 978 F. Supp. 2d 374, 382 (S.D.N.Y. 2013) (allowing an unsworn declaration that was submitted "under penalty of perjury, and dated" and in opposition to a motion for summary judgment to create a dispute of material fact).

"[W]hether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide." Esperanza v. City of New York, 325 F. Supp. 3d 288, 306 (E.D.N.Y. 2018) (citing Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1992) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.")). However, plaintiff does not point to admissible record evidence, and the undersigned has not otherwise found any, which indicates that defendant T.J. assaulted

him, and that defendant Miller observed it and did nothing to stop it.  See Olivencia v. Pun, No. 3:21-CV-739 (OAW), 2022 WL 4329343, at *9 (D. Conn. Sept. 19, 2022) (granting summary judgment where "[the p]laintiff adduces no support for, and the record fails to show, any suggestion that [the d]efendant [] was in a position to observe the correctional officers' response to the assault or that she had an opportunity to intervene in that response."); see also Usavage, 932 F. Supp. 2d at 600 (discussing the appropriateness of granting summary judgment on a failure-to-intervene claim where the plaintiff has not established an underlying constitutional violation).  Accordingly, the undersigned recommends granting defendants' motion as to plaintiff's failure-to-intervene claims against defendant Miller.

## C.  Conditions-of-Confinement Claim

"[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.'"  Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983); see also Jackson v. Marks, 722 F. App'x 106, 107 (2d Cir. 2018) (summary order) ("[A] substantial deprivation of food can cause serious physical harm sufficient to find cruel and unusual punishment in violation of the Eighth Amendment.")).  "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test."  Jolly v. Coughlin, 76 F.3d 468, 480 (2d Cir. 1996).  "To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs."  Burroughs v. Mitchell, 325 F. Supp. 3d 249, 272 (N.D.N.Y. 2018) (quotations marks and citation omitted).  "[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable

risk of serious damage to his health." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013).  As to the subjective prong, "the plaintiff must demonstrate that the defendants imposed those conditions with 'deliberate indifference.'" Jolly, 76 F.3d at 480 (citation omitted).  "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" Walker, 717 F.3d at 125 (quoting Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)).

"The denial of a medically prescribed diet may constitute an Eighth Amendment violation under certain circumstances." Rush v. Fischer, 923 F. Supp. 2d 545, 555 (S.D.N.Y. 2013), aff'd sub nom. Rush v. Canfield, 649 F. App'x 70 (2d Cir. 2016) (summary order).  For example, the continued failure to provide a diabetic incarcerated individual with a medically appropriate diet has been found to be constitutionally impermissible.  See Johnson v. Harris, 479 F. Supp. 333, 336-37 (S.D.N.Y.1979) (determining that the prison officials violated the plaintiff's Eighth Amendment rights where they knew he was a diabetic, gave him "food which, if eaten, would be injurious to his health; and that as a consequence, he is often forced to choose between endangering his health by eating the meals he is served, or foregoing part or all of those meals[]" and he lost thirty pounds in eight months).  However, "being denied a single meal does not give rise to a constitutional deprivation." Rush, 923 F. Supp. 2d at 555-56 (collecting cases) (citations omitted).  Further, although "background facts are fair game for purposes of an Eighth Amendment analysis[,] . . . '[a] successful § 1983 claim holds an individual personally responsible for the role his or her own acts or omissions played in violating someone's rights.'" Zielinski, 547 F. Supp. 3d at 235 (citation omitted) (concluding that "even taking into account all the other meals that [the] plaintiff

claims to have missed up to that point, there is simply no indication in the record that the denial of two meals on February 3 and one more meal on March 24 posed any immediate danger to [the] plaintiff's health.").

In his complaint, plaintiff asserts that Burt denied him food on June 26, 2019, after the alleged tray-throwing incident. See Compl. at 12, ¶ 49. Miller allegedly denied plaintiff his meal on July 17 and 18, 2019. See id. at 27, ¶¶ 99-100. He asserts that unidentified officials denied plaintiff the main entrée of his meal on July 21 and 22, 2019, and an entire meal on June 25, 2019. See id. at 12, ¶ 49; 27, ¶ 101. Finally, plaintiff contends that defendant T.J. denied him the main entrée of his meal on July 24, 2019. See id. at 15, ¶ 60.

During his deposition, plaintiff testified that "another sergeant that they gave me feed – a Styrofoam feed in where my food was coming to me cold, if it came without the main, like if they had chicken. It would be everything else except chicken. The main – the main entrée was missing." Dkt. No. 50-3 at 29-30. He stated that defendant Burt "didn't give me food, right. He did not feed me, right." Id. at 51-52. When asked about his conditions of confinement claim, plaintiff testified that he brought it because "they particularly did not allow me to eat. They particularly did not allow me to have cell clean up. They particularly denied me certain rights when it came to my medical diet or seeing the nurse, get my diabetic shots and insulin and stuff like that." Id. at 121.

It is undisputed that plaintiff did not receive a meal on June 26, 2019. See Dkt. No. 52-1 at 7; Dkt. No. 52-2 at 20. Defendant Burt admitted that he did not give plaintiff his meal and claims it was because plaintiff threw a food try at him. See id. at 52-1 at 7. Defendants also do not dispute that the other alleged denials of food occurred but argue

that "it is well-settled that the denial of a single meal on separate occasions does not give rise to an Eighth Amendment claim, and therefore, the claims against Defendants Burt and Miller for one meal (Burt) and two meals (Miller) should be dismissed with prejudice." Dkt. No. 49-3 at 25.

Plaintiff has failed to satisfy the objective prong to establish a conditions of confinement claim. Plaintiff has not alleged, and the record does not reflect that the denial of meals or his main entrée created an "unreasonable risk of serious damage to his health" or resulted in a decline in his health. Walker, 717 F.3d at 125; see also Mood v. Westchester Cnty., No. 19-CV-2017 (NSR), 2020 WL 4349997, at *3 (S.D.N.Y. July 29, 2020) (concluding that the plaintiff "satisfied the objective prong[]" because the "[p]laintiff has alleged that he suffers from a serious medical condition, diabetes, which requires careful monitoring of blood glucose levels. He has alleged that the meals served to him are not nutritionally adequate insofar as they have caused his blood glucose levels to rise to dangerously high levels, and have caused him to suffer several adverse [e]ffects affecting his daily activities, including extreme weakness, fatigue, dizziness, blurred vision, and drowsiness.").

During plaintiff's disciplinary hearing, defendant Burt agreed that plaintiff "is a special diet." Dkt. No. 52-2 at 46. However, plaintiff does not allege, and the record does not reflect, a decline in plaintiff's health as a result of the alleged denial of food. See Davidson v. Desai, 817 F. Supp. 2d 166, 190 (W.D.N.Y. 2011) (acknowledging records that discussed the plaintiff's need to a low cholesterol diet as prescribed by his health care provider and records showing that the plaintiff had been meals but granting summary judgment on the Eighth Amendment claim because the "[p]laintiff points to no

evidence of any adverse health impact caused by the discontinuance of the Diet Agreement, and the court's review of the record reveals none.")  As plaintiff has not satisfied the objective prong, the undersigned recommends granting defendant's motion for summary judgment on the conditions of confinement claims.  See Goris v. Breslin, 402 F. App'x 582, 584 (2d Cir. 2010) (summary order) (declining to "reach the subjective prong, because" the plaintiff failed to meet the objective prong of the deliberate indifference inquiry).

### D.  Due Process Claim

To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process.  See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004).  An incarcerated individual "has a liberty interest that is implicated by [ ] confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  J.S. v. T'Kach, 714 F.3d 99, 106 (2d Cir. 2013) (citation omitted).  "While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality."  Tavares v. Amato, 954 F. Supp. 2d 79, 93 (N.D.N.Y. 2013).  A court should make the determination "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration."  Davis v. Barrett, 576 F.3d 129, 134 (2d Cir. 2009) (per curiam) (citation omitted).

70

"[T]he Second Circuit has 'explicitly avoided' creating 'a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights,' [but] the Court has established certain guidelines." Rasheen v. Adner, 356 F. Supp. 3d 222, 237 (N.D.N.Y. 2019) (quoting Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004)). "For instance, where the plaintiff is confined for an intermediate duration –between 101 and 305 days – development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." Id. (citations omitted).  "And while confinements for less than 101 days 'under normal SHU conditions may not implicate a prisoner's liberty interest,' such confinements nevertheless" "'could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.'" Id. (quoting Palmer, 364 F.3d at 65-66).

Concerning the June 25, 2019, tray-throwing incident with defendant Burt, plaintiff alleges that the July 3, 2019, disciplinary hearing was stopped and recommenced outside of the statutorily allowed timeframe.  See Compl. at 14, ¶¶ 53. Plaintiff asserts that there was nothing "announced on the record that [Gee] would be seeking an extension or even granted one prior to statutory deadline[.]"  Id.  He also contends that there was no evidence supporting the charges: "[n]o injury was reports, no medical rep[o]rt entered the record, no evidence of food spillage on floor or wall and no photos."  Id. at 14, ¶ 55.  In his response, plaintiff states that when he met with an employee assistant, he requested "any reason or order that permitted his food to be served in Styrofoam trays through a feed up slot, plaintiff sought To/From reports,

Unusual Incident reports, any Use of Force reports.  None of the same was disclosed."
Dkt. No. 62 at 23-24.

Defendant Gee started plaintiff's hearing on July 3, 2019, seven days after he
was served with the misbehavior report.  See Dkt. No. 52-2 at 39.  Plaintiff confirmed
that he was given the misbehavior report and met with an employee assistant.  See id.
at 39-40.  Gee read the report onto the record.  See id. at 40.  Plaintiff stated, among
other things, that "there is no record on this, so I haven't seen Medical or anything . . . ."
Id. at 41-42.  Gee then read a memorandum from Sgt. Kelly's on the record which
reiterated defendant Burt's version of events and stated that "[n]o photographs of the
tray were taken, as Officer Burt had picked up the tray prior to moving on.  Officer Burt
was seen by medical and remained on duty, with no injuries reported."  Id. at 42.
Defendant Gee stated, "this was just showing that the Officer was seen by Medical as a
result of it.  Let's see here.  So, do you have any further testimony or documentary
evidence to be given (inaudible) next part of this hearing?"  Id.  Plaintiff responded,
"No."  Id.  Gee explained that "since you are (inaudible) pretty much Officer Burt's
misbehavior Report, I would like to have Officer Burt testify."  Id.  As defendant Burt was
not working that day, Gee adjourned the hearing.  See id.

The hearing was resumed on July 11, 2019, and plaintiff objected to the
timeliness of it, arguing that he was held in the SHU inappropriately.  See Dkt. No. 52-2
at 42-43.  Gee informed plaintiff that he was being held in the SHU for other unrelated
charges and that an extension had been granted.  Id. at 43.  Gee again read the
misbehavior report onto the record and asked defendant Burt if he had anything to add,
to which defendant Burt stated, "Nope, that's complete."  Id. at 44.  Gee asked Burt

about whether there was "any photographic evidence of stains, did you have any stains on your clothes that you know of?"  Id. at 45.  Burt responded, "No, when he threw the tray at me.  The tray was not opened yet, so the tray struck me in the hip and fell on the floor.  I didn't get any food on me."  Id.  Following Burt's testimony, plaintiff objected to the timing of the hearing and asked to see the extension paper, which defendant Gee showed him.  See id. at 46-47.

Following Gee's disciplinary hearing, plaintiff was sentenced to ninety days in the SHU.  See Dkt. No. 52-2 at 48.  Plaintiff was housed in the SHU beginning on June 21, 2019, because of unrelated charges, until his transfer to Upstate on August 1, 2019.  See Dkt. No. 52-1 at 10-11; Dkt. No. 51-2 at 26.  When he arrived at Upstate, he was placed in its SHU.  See Dkt. No. 57 at 40; see also Giano v. Selsky, 238 F.3d 223, 226 (2d Cir. 2001) ("As we recently suggested in *Sims v. Artuz*, 230 F.3d 14, 23-24 (2d Cir. 2000), separate SHU sentences 'should be aggregated for purposes of [determining whether a liberty interest exists]' when they constitute a sustained period of confinement.").  Based on the records provided, it appears that plaintiff was in Upstate SHU until at least August 10, 2019.  See Dkt. No. 57 at 40.  It is possible that he was in Upstate SHU until his transfer to Great Meadow Correctional Facility's general population on September 23, 2019.  See id.  Plaintiff does not allege how long he was confined in the SHU.  See generally Compl.; Dkt. No. 62.

Based on the undersigned's review of the record it appears that plaintiff was in the SHU on various charges and across two correctional facilities for ninety-five days, from June 21, 2019, until September 23, 2019.  See Dkt. No. 51-2 at 26; Dkt. No. 57 at 40.  Neither defendant Gee's ninety-day sanction nor plaintiff's ninety-five-day

73

confinement amount to the type of "atypical" and significant hardship that would implicate a protected liberty interest.  Bonet v. Khahaifa, 512 F. Supp. 2d 141, 143 (W.D.N.Y. 2007) (concluding that the plaintiff failed to present evidence that his 180-day confinement was atypical); see also Palmer, 364 F.3d at 65 (finding that disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life"); Ortiz, 380 F.3d at 654 ("[W]ith respect to 'normal' SHU confinement, we have held that a 101-day confinement does not meet the *Sandin* standard of atypicality.").

"The duration of SHU confinement, however, is not the only relevant factor.  We have said that under abnormal or unusual SHU conditions, periods of confinement of less than 101 days may implicate a liberty interest."  Ortiz, 380 F.3d at 654 (citations omitted) (concluding that the district court erred in dismissing the plaintiff's due process claim based solely on the duration of confinement where the plaintiff alleged "that for at least part of his confinement, he was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering 'for weeks at a time.'").  In his complaint, plaintiff alleges that when he entered the SHU, he was assaulted, and while there, he was denied his meal or entrée to his meal on several occasions.  See Compl. at 12, ¶ 49; 15, ¶ 60; 22-23, ¶ 86; 26-27, ¶ 98-101.

"While the Second Circuit has declined to delineate the precise contours of normal SHU confinement . . . it is sufficient to note that," "ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week."  Thomas v. DeCastro,

74

No. 14-CV-6409 (KMK), 2018 WL 1322207, at *6 (S.D.N.Y. Mar. 13, 2018) (quotation marks omitted) (quoting Ortiz, 380 F.3d at 655).  Plaintiff does not allege that any of these "normal" conditions were nonexistent during his SHU confinement.  See generally Compl.; see also Martinaj v. Uhler, No. 9:18-CV-00257 (BKS/DJS), 2019 WL 652251, at *8 (N.D.N.Y. Feb. 15, 2019) ("The facts alleged in the Complaint do not indicate that [the p]laintiffs were confined to their cells for longer than the typical duration per day, that they were denied exercise or adequate showers, or that most of the [p]laintiffs were otherwise exposed to conditions constituting atypical and significant hardships.").  An incarcerated individual should not be subject to random, unwarranted assaults or denied their food for no reason; however, plaintiff does not allege that he was subject to conditions in the SHU that cannot or do not occur to incarcerated individuals in the general population.  As such, he has not, as a matter of law, established an "atypical and significant hardship."  Sandin, 515 U.S. at 484.

Even if plaintiff had established a liberty interest, his claim would fail as a matter of law because plaintiff received appropriate process.  "[T]he Fourteenth Amendment requires inmates receive certain protections including: (1) at least twenty-four hours written notice of the disciplinary charges; (2) the inmate be permitted to call witnesses and present evidence 'when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals';" "(3) the inmate be judged by a fair and impartial hearing officer; (4) the disciplinary conviction be supported by some evidence; and (5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken."  Tubbs v. Venettozzi, No. 9:19-CV-0126 (LEK/DJS), 2022 WL 7274397, at *4 (N.D.N.Y. July 20,

75

2022) (citing <u>Wolff v. McDonnell</u>, 418 U.S. 539, 563-66 (1974)), <u>report and recommendation adopted</u>, 2022 WL 4545542 (N.D.N.Y. Sept. 29, 2022).

Plaintiff does not allege that he was denied any of the above.  Rather, plaintiff alleges that Gee denied him access to reports written about the tray-throwing incident and charges.  <u>See</u> Compl. at 25, ¶ 93.  Plaintiff was not provided a copy of the memorandum from Sgt. Kelly detailing the incident and defendant Burt being seen by medical.  <u>See</u> Dkt. No. 52-2 at 42.  However, defendant Gee read this report onto the record and in front of plaintiff.  <u>See id.</u>  "To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." <u>Clark v. Dannheim</u>, 590 F. Supp. 2d 426, 429 (W.D.N.Y. 2008).  Plaintiff has not alleged how the failure to provide the report to him but to have it read to him caused him to be prejudiced.  <u>See</u> <u>Peterson v. Lindstrand</u>, No. 9:19-CV-569 (GTS/DJS), 2022 WL 686634, at *5 (N.D.N.Y. Feb. 15, 2022) ("[The p]laintiff objects that he was not provided with a copy of the Unusual Incident Report addressing this incident prior to the hearing. . . .  [The p]laintiff concedes, however, that the Report was read to him at the hearing by Defendant Lindstrand.  As a result, he was aware of the contents of the report and has not established prejudice from the fact that he did not have an actual copy of the report."), <u>report and recommendation adopted</u>, 2022 WL 685289 (N.D.N.Y. Mar. 8, 2022).

As to plaintiff's claim concerning the timing of the hearings, "[d]ue process for an inmate disciplinary hearing does not encompass a right to a speedy hearing." <u>Barnes v. Henderson</u>, 628 F. Supp. 2d 407, 411 (W.D.N.Y. 2009).  "The Second Circuit has held

that the lack of a speedy hearing alone 'would not be enough generally to establish a constitutional claim.'" Id. (quoting Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995)); see also Nelson v. Plumley, No. 9:12-CV-422, 2014 WL 4659327, at *11, n.15 (N.D.N.Y. Sept. 17, 2014) (citations omitted) ("[The p]laintiff's also complains that his disciplinary hearing was not timely commenced.  That argument, however, is based upon New York State regulations governing disciplinary hearings.  It is well settled, however, that 'violations of state law that do not deprive the plaintiff of a right 'secured by the Constitution and laws' are insufficient to support a claim under [section] 1983.'").

Although "7 N.Y.C.R.R. § 251–5.1(b) provides that a disciplinary hearing must be completed within 14 days following the writing of the misbehavior report, unless otherwise authorized[,]" "disciplinary proceedings may be commenced or continued outside of the time limits prescribed by the New York State regulations if a request for an extension is filed." Brooks v. Prack, 77 F. Supp. 3d 301, 321-22 (W.D.N.Y. 2014) (citing, inter alia, Lewis v. Murphy, No. 9:12-CV-00268 (NAM), 2014 WL 3729362, at *14 (N.D.N.Y. July 25, 2014) (disciplinary hearing was timely commenced where extensions were requested)).

Here, the record indicates that plaintiff received the misbehavior report on June 26, 2019; the hearing was initially started on July 3, 2019; and the hearing was adjourned and restarted on July 11, 2019.  See Dkt. No. 52-2 at 39, 42.  Even if plaintiff could establish a due process violation by the hearing being adjourned and restarted fifteen days after receipt of the report, the record reflects that Gee received an extension to hold the hearing by July 12, 2019.  See id. at 46.  Plaintiff was shown the

extension paperwork during the hearing.  See id.  As such, plaintiff has failed to establish a due process violation.  See Brooks, 77 F. Supp. 3d at 321-22.

Finally, to the extent plaintiff asserts that there was no evidence to find him guilty of an assault on staff, "judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence." Whitley v. Miller, 57 F. Supp. 3d 152, 158 (N.D.N.Y. 2014) (quotation marks and citation omitted); see also Compl. at 14, ¶ 55.  The Court must determine "whether there was reliable evidence of the inmate's guilt." Luna v. Pico, 356 F.3d 481, 488 (2d Cir. 2004) (citation and quotation marks omitted).  "[I]t is not the role of the Court to evaluate the credibility of witnesses at a disciplinary hearing." Johnson v. Goord, 487 F. Supp. 2d 377, 385 (S.D.N.Y. 2007).  Here, Gee determined that the disciplinary charges were supported by the misbehavior report, defendant Burt's testimony, and Sgt. Kelly's memorandum which "reiterat[ed] CO Burt's account." Dkt. No. 52-2 at 48.  Plaintiff's statement that there was no evidence to find him guilty is essentially an attack on Gee's credibility determination which does not amount to a due process violation.  See Tubbs, 2022 WL 7274397, at *5.  Moreover, Burt's testimony was consistent with the misbehavior report, which constitutes "some evidence[.]"  Id. (collecting cases) (citations omitted); see also Dkt. No. 52-2 at 42-45.  In sum, because plaintiff has not established that a liberty interest was at stake, he was afforded sufficient process, and there was "some evidence" to support Gee's finding, it is recommended that the motion for summary judgment on plaintiff's due process claim be granted.

## VI. Conclusion

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 49) be **DENIED IN PART** insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim and Eighth Amendment excessive force claim against defendant Miller; and Eighth Amendment excessive force claims against defendants Aucter and Drake; and it is further

**RECOMMENDED**, that the Court hold an exhaustion hearing to determine if administrative remedies were available to plaintiff concerning only those claims permitted to proceed past summary judgment; and it is

**RECOMMENDED**, that plaintiff be ordered to show good cause, within thirty (30) days of the District Court's adoption or rejection of this Report-Recommendation and Order, as to why defendant T.J. should not be dismissed from this action without further order of the Court for his failure to identify and/or serve defendant T.J.; and it is further

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 49) be **GRANTED IN PART** and that plaintiff's remaining claims be **DISMISSED**; and it is further

**RECOMMENDED**, that the complaint (Dkt. No. 1) be dismissed in its entirety against defendants Knapp, Gaurin, Burt, and Gee; and it is

**ORDERED**, that that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules; and it is further

**ORDERED**, that the Clerk of the Court amend the case caption to reflect Justin Miller, the first-named still remaining defendant, as the lead defendant in the case.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 6(a), 6(e), 72.[19]

Dated: January 3, 2023
       Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[19] If you are proceeding pro se and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation & Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).